**WEBSTER EISENLOHR, Inc., v. KALOD-NER, Judge, et al.**

No. 8412.

Circuit Court of Appeals, Third Circuit.

Argued Feb. 8, 1944.

Reargued Aug. 7, 1944.

Decided Sept. 27, 1944.

John Wallis, of New York City, (Drinker, Biddle & Reath, of Philadelphia, Pa., Mudge, Stern, Williams & Tucker, of New York City, Andrew M. Williams, of New York City, Philip Wallis and Hayward H. Coburn, both of Philadelphia, Pa., and Herbert H. Faber, of New York City, on the brief), for petitioner.

Judge Kalodner submits on brief.

Before BIGGS, MARIS, JONES, GOODRICH, and McLAUGHLIN, Circuit Judges.

GOODRICH, Circuit Judge.

The proceedings at bar are upon a petition to this court for writs of mandamus and prohibition to be directed to the Honorable Harry E. Kalodner, one of the Judges of the District Court of the United States for the Eastern District of Pennsylvania, and David Bortin, Esq., a Special Master appointed pursuant to his order.

Judge Kalodner has filed an answer to the petition. Mr. Bortin has filed none.

The essential facts are not in dispute. Andrew J. Speese, 3rd, alleging himself to be a citizen and resident of Texas and the owner of 10 shares of the preferred stock of the petitioner, Webster Eisenlohr, Inc., a Pennsylvania corporation, filed a suit against that company on February 1, 1943, in the District Court of the United States for the Eastern District of Pennsylvania. The action was brought by Speese "for and on behalf of all the preferred stockholders" of Webster Eisenlohr, Inc. The complaint, inter alia, described the division of the stock of the company into common and preferred shares and alleged that dividends on the preferred shares had remained unpaid since April 1, 1931, and, as of December 31, 1941, amounted to $75.25 per share; that the certificate of incorporation of Webster Eisenlohr, Inc., provides that the preferred stock shall not be entitled to vote at any meeting of stockholders, and shall not be entitled to participate in the management of the corporation "* * * unless and only in the event [that] (1) two quarterly dividends payable thereon shall be and remain unpaid and in arrears, * * * whereupon * * * full voting power shall be vested in the preferred stock, until the arrearages of accumulated dividends upon * * * [the] preferred stock shall have been paid * * *." It was further alleged that at the annual meeting of stockholders of the corporation on March 10, 1942, Speese, acting for himself and as proxy for 815 shares of preferred stock, demanded that the voting power be vested exclusively in the preferred stock and that the corporation, acting through its president, refused the demand and ruled that the preferred stock and common stock together had the voting power to elect directors; that the company persisted in this attitude despite frequent demands of Speese and other preferred stockholders; that the corporation is dominated and controlled by the Chase National Bank of the City of New York by reason of its ownership of a large block of the common stock of the company and that the control of Webster Eisenlohr, Inc., had been "usurped" by reason of the action of the company in refusing to recognize the officers elected by the preferred stock; that the alleged usurpation "is in fraud of the rights and privileges of the preferred stockholders and has had the effect of illegally depriving * * * [them] of their right to name directors"; and that the assets and property of Webster Eisenlohr, Inc., are being managed, controlled, financed and otherwise disposed of for the sole benefit of the holders of the common stock to the "irreparable injury and prejudice of the preferred stockholders, notwithstanding the financial ability of the defendant company to pay or secure the rights and privileges * * *" of the preferred stockholders.

Speese prayed that the court adjudge that the preferred stockholders possess presently the exclusive voting power in the company, that a receiver pendente lite be appointed, and that general relief be granted.

Webster Eisenlohr, Inc., filed an answer denying the substance of the allegations of

the complaint and set out two affirmative defenses which need not be stated here.

Between hearings upon the matter before the District Court the company sent to its stockholders copies of its annual report for the year 1942. Following the sending of the report the company also wrote its preferred stockholders, offering to purchase their interests. Copies of these documents were supplied to the District Judge upon his request although not introduced in evidence in the litigation. At one of the hearings Judge Kalodner indicated his belief that the financial statement sent by the corporation to stockholders was misleading and he criticized the letter sent to preferred stockholders for failure to state facts which he deemed material. Then, at a hearing on April 24, 1943, counsel for Speese stated to the court that he had no client since the shares of Speese and other stockholders which he had represented had been purchased. Judge Kalodner again expressed his dissatisfaction with the actions of the company and stated: "I will advise you gentlemen that I am going to appoint an examiner to look into this matter." Subsequently the court did appoint Mr. Bortin as Special Master under Rule 53 of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c. The Special Master was directed "to investigate: the acts, conduct, property, liabilities, financial condition, books, records and assets * * * [of Webster Eisenlohr, Inc.]; all the circumstances relating to an Offer made March 26, 1943 to the Holders of 7% Cumulative Preferred Stock * * *; the arrangement made by and between * . * * [Webster Eisenlohr, Inc.] with White, Weld & Co. of New York and Bertram K. Wolfe, Esq. with reference to the Offer made to the Preferred Stockholders; the conduct of the Board of Directors * * * with reference to the making of said Offer to the Preferred Stockholders; the propriety, reasonableness and adequacy of the said offer to the Preferred Stockholders; the question as to whether or not there was any violation of Rule X–10B–5 'Employment of Manipulative and Deceptive Devices' of the Securities and Exchange Commission, and any other matters which may be referred to the Special Master by the Court as relevant to these proceedings."

Counsel for Webster Eisenlohr, Inc., sought vacation of the order in the District Court and, failing that, asks a writ of mandamus directing the District Court to vacate this appointment and a writ of prohibition directed to the Special Master to prevent him from carrying out his commission. A majority of the court believe the company's position to be well taken.

The fundamental proposition which probably no one would dispute is that a court's power is judicial only, not administrative nor investigative. A judgment may only be properly given for something raised in the course of a litigation between the parties.[1] Now, what was the litigation in this case? The complaint presents the question of the legal effect of the provision that preferred stockholders, under given circumstances, shall have full voting power. Whether full voting power means that they may vote along with holders of shares of the common stock or whether "full" as used in the certificate of incorporation means "exclusive" is a question of interpretation of language to be made with such help as the Pennsylvania decisions give, since the corporate litigant is a Pennsylvania corporation. The allegations of fraud made in the complaint are conclusions from the plaintiff's claim that he and other preferred stockholders were entitled to exclusive voting rights and did not get them. This interpretation is corroborated by a letter sent by counsel for Speese "To the Remaining Preferred Stockholders * * *" of the company giving information concerning the institution of the Speese suit. The letter said "The gist of the suit was to settle, if possible, the long standing controversy between the preferred stockholders and the company as to whether or not the preferred stockholders should have the exclusive voting power in the company in view of the default in the payment of dividends, as distinguished from the right to vote together with the common stockholders."

If the plaintiff's contentions on voting rights are upheld as a matter of law, the

[1] Reynolds v. Stockton, 1891, 140 U.S. 254, 266, 270–271, 11 S.Ct. 773, 35 L. Ed. 464; Osage Oil & Refining Co. v. Continental Oil Co., 10 Cir., 1929, 34 F.2d 585; Georgia S. & F. Ry. Co. v. Einstein, 5 Cir., 1914, 218 F. 55, certiorari denied 1915, 239 U.S. 643, 36 S.Ct. 164, 60 L.Ed. 483; J. P. Jorgenson Co. v. Rapp, 9 Cir., 1907, 157 F. 732; Bradley v. Converse, 1876, Fed.Cas.No.1,775, 4 Cliff. 366; Munday v. Vail, 1871, 34 N.J.L. 418.

preferred stockholders are entitled to determine who shall manage the corporation, and other questions which may be determined by stockholders. They are entitled to court help to get those rights if they need it. On the other hand, if the plaintiff's contentions as to the meaning of the phrase are incorrect, they have alleged no legal grounds for complaint. While a receiver was asked for, it was simply in connection with the relief to be given the plaintiff, based on the correctness of this theory of his voting rights. No one disputed the solvency of the corporation.

The directions given the Master went far beyond anything involved in the issues presented in the litigation, as will be seen from the reading of the order appointing him.

■ Masters are provided for in the Rules of Civil Procedure, Rule 53. This rule does not, in so many words, place any limitation on the scope of a master's commission. Nor has that question, apparently, been the subject of a great deal of litigation. There are general statements supporting the view that an order of reference cannot be more extensive than the allegations and proofs of the parties and there is some judicial authority to this effect.[2] No authority has been found the other way.[3]

■ On principle, however, the matter seems clear. Rule 53 is explicit in its statement that "A reference to a master shall be the exception and not the rule" and that in actions to be tried without a jury "a reference shall be made only upon a showing that some exceptional condition requires it."[4] It is clear, we think, that a master is appointed only to help the court in a case where the help is needed. His appointment and activities are only for the purpose of assisting the court to get at the facts and arrive at a correct result in a complicated piece of litigation pending before the court. The master operates as an arm of the court. Surely he has no wider scope of activity than the court itself. If the court is limited in its judicial duties, to deciding the issues presented in the litigation before it, the master's function can go no further than to aid in the court's discharge of its duties.

■ In this case the report made by the company to its stockholders and the circumstances under which some of the preferred stockholders disposed of their interests were not before the court in the then pending law suit. The District Judge felt that there were indications that the company had not been entirely aboveboard in the matter. The company, through its counsel, earnestly contended that it had been entirely fair. This court refused to hear counsel on that point, for we thought the matter not relevant. None of these stockholders was under guardianship; all had the full legal power to sell their shares under such circumstances as it pleased them to sell. If any one felt that he had been deceived, he could take the steps necessary to protect his rights. There was no indication that any party to the transaction was complaining. We think that neither the report to the stockholders nor the sale of their stock was involved in the litigation. It was therefore outside the scope of investigation both by the Special Master and the court itself.

We do not think this view imposes unduly restrictive limitations upon courts. The judicial power is limited to deciding

---

2 "The order [of reference] cannot be more extensive than the allegations and proofs of the parties." 30 C.J.S., Equity, § 530, citing Consequa v. Fanning, N.Y. 1818, 3 Johns.Ch. 587, mod. on other grounds, N.Y.1820, 17 Johns.Ch. 511, 8 Am.Dec. 442. The "order and reference must be founded on the pleadings and proofs, and cannot be made more extensive than the allegations of the parties; the court has no power to refer matters not thus put in issue." 1 Kocher and Trier, New Jersey Chancery Practice and Precedents (1924) § 520, citing Wycoff v. Combs, 1877, 28 N.J.Eq. 40. To the same effect is 1 Whitehouse, Equity Practice (1915), § 357, citing Levert v. Redwood, Ala.

1839, 9 Port. 79. See also Bland v. Stewart, 1891, 35 W.Va. 518, 14 S.E. 215.

3 In United States v. American Bell Tel. Co., C.C.D.Mass., 1889, 39 F. 230, the court refused to restrict the testimony to be taken before an examiner to the single issue of fraud plead by one of the defendants since the other defendant had answered generally and plaintiff had filed replications to both defendants' answers.

4 Counsel for Webster Eisenlohr, Inc., urges that there is no such showing of exceptional circumstances in this case. The point is a serious one, but we do not need to settle it, since our decision is being placed upon a broader ground.

controversies. That has been its function historically; that is its function under the Constitution of the United States. No doubt a great deal goes on in the world which ought not to go on. If courts had general investigatory powers, they might discover some of these things and possibly right them. Whether they would do as well in this respect as officers or bodies expressly set up for that purpose may be doubted, but until the concept of judicial power is widened to something quite different from what it now is courts will better serve their public function in limiting themselves to the controversies presented by parties in litigation.

■■ The final point required for our attention is the application of Rule 23(c) of the Federal Rules of Civil Procedure. "A class action shall not be dismissed or compromised without the approval of the court. * * *" The suit here in question was the type known as a "spurious" class suit. Speese, the original litigant, brought the action on behalf of himself and other persons similarly situated, that is other persons who were preferred shareholders in Webster Eisenlohr, Inc., and had the same interests as Speese had in determining the voting rights of the preferred shareholders. If, after the litigation started, Speese could dismiss the suit or compromise it by taking something less than he originally claimed, the rights of other people (that is other preferred shareholders) might be adversely affected.[5] The statute of limitations might have run or subsequent suit might be met by a charge of laches and so on. So the rule in question was to provide against such adverse effect when a plaintiff who starts an action becomes faint-hearted before its completion or gets what he wants by compromise.

But, in this case the original action is still pending in the District Court for the Eastern District of Pennsylvania. Other preferred shareholders may intervene under Rule 24. The company stipulates that it will raise no obstacle against their intervention, a harmless stipulation since they are entitled to intervene as of right anyway. It also stipulates that it will not ask for dismissal of the suit. Without such stipulation, however, the suit is there in the District Court, notice of it was given to all preferred stockholders and any preferred stockholder who wishes to litigate the question presented by the complaint can do so. The suit cannot be dismissed without court approval. Rule 23(c) therefore is not applicable to the present case. Malcolm v. Cities Service Co., D.C.Del.1942, 2 F.R.D. 405. See also Heesch v. Pittsburgh Steel Co., D.C.W.D.Pa.1941, 40 F.Supp. 243.

In view of the above discussion we think it unlikely that the formal issuing of the writs prayed for will be necessary. The applicant may later apply to this court if the need presents itself. No order for costs will be made.

BIGGS, Circuit Judge (dissenting).

There are certain aspects of the factual background of the case of Speese v. Webster Eisenlohr, Inc.,* which should be stressed in order that it may be plain why the learned District Judge entered the order complained of. At the first hearing, that held before Judge Kalodner on March 2, 1943, the court indicated from the bench that it might well conclude that the phrase "full voting power" entitled the preferred stock to "exclusive" voting power. Shortly thereafter, on March 23, Webster Eisenlohr, Inc., sent to its stockholders copies of the company's annual report for the year 1942. This report stated, "The net profit from operations for the calendar year amounted to $405,451.73 before provision for Federal Income Taxes, and to $235,751.73 after deduction of $169,700 as the estimated amount required for such taxes, as compared with $192,595.24 for the preceding calendar year in which no provision for Federal Income Taxes was considered necessary or made. This was equivalent to

---

[5] See Piccard v. Sperry Corporation, D.C.N.Y.1941, 36 F.Supp. 1006, affirmed, 2 Cir.,1941, 120 F.2d 328. "Generally speaking a stockholder-plaintiff can prejudice the cause of action in two ways: one by discontinuing the suit, and second by compromising the suit and obtaining the entry of a consent judgment. The discontinuance may result in the surrender of an advantage already gained in the litigation, or even if ostensibly effected without prejudice may subject the cause of action to the statute of limitations. Compromising a suit and entering a consent judgment, in the absence of a showing of fraud or collusion, destroys a right of action." McLaughlin, Capacity of Plaintiff-Stockholder to Terminate a Stockholder's Suit (1937) 46 Yale L.J. 421.

* No opinion for publication.

49¢ per share on the common stock for 1942, after deduction of the estimated amount required for such taxes and other allowances for unpaid preferred dividends accrued in said year, as compared with 38¢ per share for the preceding year 1941." On March 26, the president of Webster Eisenlohr, Inc., sent a letter to its preferred stockholders stating that at any time within thirty days thereafter they might dispose of their shares "* * * at the price of $150, flat, for each share, to Messrs. White, Weld & Co. * * * from whom the Company has agreed * * * to purchase such shares within a period of 120 days at the said price." The letter also stated that counsel for Speese, "* * * has consented to assist in the submission of this offer to the holders of the Preferred Stock he represents or with whom he may have contacts and we have agreed to compensate him for his services in such connection."

On April 20, 1943 counsel for Webster Eisenlohr, Inc., sent Judge Kalodner certain letters and documents requested by him. These included a copy of an agreement between the company and White, Weld & Co. whereby these brokers were to receive a fee of $10,000 for purchasing the stock, a copy of the understanding between the company and counsel for Speese, and a copy of the company's annual report for 1942 from which I have quoted, with accompanying financial statements. Included also with the letter to Judge Kalodner was a letter dated April 15, 1943, written by New York counsel for Webster Eisenlohr, Inc., to that company's Philadelphia counsel. This letter shows that counsel for Speese was to receive $7.50 per share for each share of preferred stock delivered and sold to the company's brokers and that the company furnished this counsel a list so that he could get in touch with the preferred stockholders.[1]

At the next hearing which was on April 30 Judge Kalodner indicated his belief that the financial statement sent to its stockholders by the corporation was misleading in that it indicated to the preferred stockholders that their stock presently would receive but $7 a share by way of dividends, the balance of the corporate earnings being available for the common stock. Counsel for the company denied the correctness of the court's remarks. Judge Kalodner also criticized severely the letter of March 26 which had been sent to the preferred stockholders offering to buy their stock at $150 a share because, he asserted, there was no disclosure of the fact that the company's earnings for the first quarter of 1943 amounted to approximately $26 per share which might be available for the preferred stock. The company through its counsel insisted that this sum could not be deemed to be allocable to the preferred stock because the charter provided that dividends could be paid defendants only out of "surplus profits."[2]

At a hearing on May 24, 1943, counsel for Speese stated to the court that he had no client, that Speese's stock had been purchased as had that belonging to the other stockholders whom he had represented, and that only a few stockholders remained who had not sold their preferred stock to the company.[3] He also said: "The Court took the position that it was interested in this settlement. We went over the facts of the

---

[1] The letters and documents just referred to appear in the appendix under the heading, "The following documents have been printed at the request of the respondents. The petitioner does not concede that they, or any of them, are otherwise relevant and material." Since they were sent to the District Judge at his request by counsel for Webster Eisenlohr, Inc. and, demonstrably, had their part in shaping the court's subsequent actions, I think they may be considered to be properly a part of the record before us. They are relevant and material.

[2] Counsel for the petitioner did not define this term and since the pertinent provision of the charter is not before us it is difficult to tell what he meant. Perhaps the reference is to an existing deficiency in capital which may prohibit the payment of dividends until made up.

[3] Counsel for Spees stated, " * * * the actual facts are that the 1200 or 1400 shares of preferred stock that I represented, and on whose behalf I filed the bill, sold their stock. There are about a hundred * * * shares scattered amongst maybe five or six preferred stockholders that have not sold their stock. But included in the ones who have sold their stock, is the actual plaintiff in the case." Counsel for the petitioner stated at the reargument before this court that the number of preferred shares and the number of preferred stockholders were substantially in excess of the numbers given by counsel for Speese.

settlement; and it has been consummated to a great extent." Judge Kalodner stated: "There cannot be an actual settlement without approval of the Court, so far as a class bill is concerned."[4] There followed further discussion of the actions which the company had taken in purchasing preferred stock. Judge Kalodner again severely criticized the actions of the company which were defended by its counsel and at the close of the hearing Judge Kalodner stated: "I will advise you gentlemen that I am going to appoint an examiner to look into this matter." The case was then continued until a later day.

At some date not clear from the record but probably about the time of the hearing of May 24, counsel for Speese sent a letter "To the Remaining Preferred Stockholders" of the company, giving information concerning Speese's suit and stating: "The gist of the suit was to settle, if possible, the long standing controversy between the preferred stockholders and the company as to whether or not the preferred stockholders should have the exclusive voting power in the company, in view of the default in the payment of dividends, as distinguished from the right to vote together with the common stockholders." This letter informed the remaining preferred stockholders that since the Speese suit was instituted the company had "acquired at $150.00 flat per share and cancelled 4047 shares of the preferred stock, and 990 shares are now outstanding"; that Speese's shares had been purchased by the company and that as a result of these developments "* * * the court action is presently without competent parties to carry on the litigation. As a shareholder who has not sold his stock, you may be entitled to intervene and carry on the suit, if you so desire."

On June 9 the court entered the order complained of and gave the Special Master the directions set out in the majority opinion. The order of reference also directed the Special Master to make a report to the court and authorized him to examine directors and officers of the company and any other witnesses concerning the foregoing matters.

On June 26 argument was had before Judge Kalodner on a motion to vacate the order of reference. He refused to vacate it. The petition to this court followed.

The answer of the District Judge alleges that the president of the petitioner purchased a block of the petitioner's common stock in May 1943 "as disclosed by published Securities Exchange Commission reports"; that the management of the petitioner sent to Speese's counsel a list of the holders of shares of preferred stock and offered to pay him the sum of $7.50 per share as a brokerage commission for all shares which he assisted the company to purchase from preferred stockholders, and that counsel for Speese received this commission; and that these facts were not disclosed to the preferred stockholders. The District Judge also asserts in his answer that the management of the company agreed to pay a brokerage fee of $10,000 to White, Weld & Co., brokers, for procuring the sale of stock from preferred stockholders at the price of $150 per share and that this fact also was not disclosed to the preferred stockholders. No testimony was offered to or received by this court. There is, however, no fundamental difference between the parties as to any question of fact.

Certain aspects of the order of reference complained of and the law relating thereto require discussion.

I. The suit is a "spurious" class suit since it was brought by Speese as a preferred stockholder on his own behalf and on behalf of the other preferred stockholders and there is a common question of law and fact affecting the several rights of the preferred stockholders and a common relief sought. See Rule 23(a) (3) of the Rules of Civil Procedure, 28 U.S.C.A. following Section 723c, and the decision of this court in Pennsylvania Company v. Deckert, 3 Cir., 123 F.2d 979. It is clear that the District Court has jurisdiction of the parties and of the cause of action.

The majority say, and I agree, that a "judgment may only be properly given for something raised in the course of a litigation between the parties." But this is *not* the point. Assuming that no issue raised by the pleading is embraced in the order of reference to the Special Master,[5] I think it is plain that a district court of the United States, like any other court of comparable

4 For further particulars as to this colloquy see p. 110 of the transcript of the proceedings before the District Court.

5 The majority state that the allegations of fraud made in the complaint are conclusions based on Speese's claim that he and the other preferred stock-

jurisdiction, has the power to make an order in aid of or ancillary to a proceeding of which it has jurisdiction. Subject always to a proper exercise of legal discretion, the court may inquire into and determine questions ancillary to, or closely connected with, the issues before it in a pending case. It also may appoint such officers as it may require to assist it. For example it would not be questioned that a federal district court might appoint a next friend for a minor plaintiff or defendant for the purpose of having the advantage of that officer's recommendation and advice as to whether or not a proposed settlement should be made or received. If a next friend of a minor plaintiff by reason of collusion with the defendant proposed an inadequate settlement, who can doubt that the court would have power to investigate the circumstances? If a trustee should propose to liquidate a cause of action asserted by him in a suit brought on behalf of his cestui, can it be doubted that a chancellor would have the power to inquire into the circumstances of the settlement in order to determine whether or not it should be made? The examples which I have given are those in which a trust relationship exists but it is fundamental that the management of a corporation is in a position analogous to that of a trustee in respect to minority stockholders. A trust relationship requires that those in fiduciary positions disclose to their cestuis all pertinent information relating to the interests of the cestuis. It is fundamental that a relationship analogous to a trust relationship exists between the management of a corporation and its stockholders, the corporation and its officers being required to disclose fully to the stockholders all pertinent information relating to the financial condition of their company as well as any facts pertinent to any compromise of stockholders' claims. The withholding of such information might invalidate such a compromise.

Under the circumstances presented by the case at bar it is not necessary to determine what may be the powers of a district court

---

holders were entitled to exclusive voting rights and did not get them. The majority then refer to the letter written by Speese's former counsel "To the Remaining Preferred Stockholders * * *" and treat this letter as a corroboration of the petitioner's assertion that the only issue presented by the pleadings in Speese's suit against Webster Eisenlohr, Inc. was the determination of the right to exclusive voting by the preferred stockholders. The complaint, however, as I construe it, contains a graver charge. It alleges that "* * * the assets and property of the defendant company are being managed, controlled, financed and otherwise disposed of for the sole benefit of the holders of the common stock to the irreparable injury and prejudice of the preferred stockholders, notwithstanding the financial ability of the defendant company to pay or secure the rights and privileges of said preferred stockholders." The complaint alleges also that a bank controls a large block of the common stock of Webster Eisenlohr, Inc., and that its officers and directors who had been elected officers and directors of Webster Eisenlohr, Inc., were operating that company for the protection of the bank's interests in disregard of the rights of the preferred stockholders. These allegations constitute charges of corporate fraud and under our present system of pleading they are none the less potent because they are conclusions. Any pre-ferred stockholder might intervene and avail himself of any of the causes of action set out by the pleading. Evidence offered by such an intervening stockholder could not be limited by what Speese's counsel deemed to be the single issue presented by the pleading which he had filed. It should be observed also that at the time Speese's counsel wrote the letter referred to he had ceased to represent Speese and in fact represented no stockholder. His interpretation of the issues presented by the pleading therefore may not be deemed to be binding even upon those preferred stockholders whom he had represented.

For the reasons stated I think it is impossible to say that the issues presented by the pleading are as restricted as the majority conclude. The Special Master was directed "to investigate; the acts, conduct, property liabilities, [and] financial condition [of Webster Eisenlohr, Inc.] * * *" Since the complaint prays for the appointment of a receiver and alleges that the property of the corporation has been used for the benefit of the common stockholders in derogation of the rights of the preferred stockholders, the court was entitled to make use of a master in order to advise itself in the premises. See Ex parte Peterson, 253 U.S. 300, 40 S. Ct. 543, 64 L.Ed. 919; In re Utilities Power & Light Corporation, 7 Cir., 90 F.2d 798, 800.

of the United States to investigate the circumstances of a compromise arrived at in a strict adversary litigation; that is to say, a litigation in which the parties were entitled to deal at arms' length with one another. But it should not be doubted that a judge of a district court of the United States, sitting as a chancellor, possesses the power to investigate the circumstances under which parties to a pending litigation have compromised claims which are the subject matter of the suit pending before him. If the judge has reason to believe that a compromise of the complainants' claims has been arrived at by fraud, by collusion, by deceit or by the withholding of pertinent information, he may not be accused of a breach of discretion if he investigates the circumstances of the compromise.[6] A chancellor does not serve merely as a referee in a litigation before him, administering strict technical rules without regard to fundamental principles of justice.

This is so because the suit looks toward a decree of the court, even if it be only a decree of dismissal for want of prosecution. Any decree disposes of some rights of the litigants, substantive or procedural. Any decree, even if it be only a decree of dismissal, may be impeached at the term at which it was entered if it has been arrived at because a cestui or one in a position analogous to that of a cestui has been subjected to fraud, collusion, deceit, or to the withholding of pertinent information by those who are in a position of trust in relation to him. After the end of the term such a decree may be impeached by a bill of review. For this reason a court may and must take cognizance of the circumstances surrounding litigation before it. If it does not do so, the decree entered by it may become a nullity. A district court of the United States is empowered by Section 262 of the Judicial Code, 28 U.S.C.A. § 377, to employ all writs necessary for the exercise of its jurisdiction in a pending cause. Judge Kalodner in reality availed himself of the provisions of this section in making the order of reference complained of. I

am of the opinion that unless he acted in abuse of his legal discretion, the order, subject to certain qualifications hereinafter referred to, should stand.

On the question of possible abuse of the court's discretion, referring specifically to the conduct of Webster Eisenlohr, Inc., I think it is apparent that that company's annual report for the year 1942, sent to stockholders on March 23, 1943, was lacking in candor. A preferred stockholder, unversed in corporate law, might have gathered from the report that despite the fact that the company had a net operating profit for the year 1942 in excess of $235,-000, a sum sufficient to reduce the arrearage of accumulated dividends on the preferred[7] stock by approximately 75%, only the sum of $7 per share was immediately available for the preferred stockholders, the balance being allocable to the common stock. It appeared also that the company was buying its preferred stock at $150 flat, the excess of $50 per share over the par value of the preferred stock being less than the company's net operating profit for the year. It is evident also that the company in the first quarter of 1943 made net profits allocable to the preferred stock of $26 a share. If the earnings continued at that rate by the end of 1943 the arrearages of cumulative dividends upon the preferred stock not only could have been wiped out but the stock could have been redeemed at its redemption value of approximately $197 a share.[8] It appears also that Webster Eisenlohr, Inc., paid the sum of $750 per 100 share certificate to the plaintiff's attorney for the preferred stock which his clients, or those with whom he got in contact, sold to the company. This is an astonishing commission; more than 2,000% above that permitted to a broker on a regulated exchange. The brokerage house acting for the company also received a fee of $10,000 as compensation for its efforts in acquiring preferred stock for the company. It does not appear that the nature and extent of the brokerage fees were made known to the preferred stockholders. The consideration of these items might well have led Speese

---

[6] These examples are given for the purpose of illustrating what I conceive to be the powers of the court. They are to be considered as examples and not as illustrative of the conduct of Webster Eisenlohr, Inc. or any person connected with it. I shall deal specifically with certain aspects of the company's conduct at a later point in this opinion.

[7] The arrearage amounted to $82.25 per share of preferred stock as of the date of the annual report.

[8] The preferred stock according to the financial statement of the company was redeemable at $115 per share plus accrued dividends. This would amount to about $197 per share.

and the preferred stockholders associated with him in his litigation to hold their stock for higher prices. Webster Eisenlohr, Inc., is a Pennsylvania corporation. It is clear that a trust relationship exists under the law of Pennsylvania between the management of the company and its preferred stockholders. See Bailey v. Jacobs, 325 Pa. 187, 194, 189 A. 320, 324. In view of these circumstances I cannot conclude that the District Judge abused his discretion in appointing a master to inquire into the circumstances attendant upon the settlement of the claims of the preferred stockholders.

II. At the reargument before this court, counsel for the petitioner stated that all preferred stock which had not been purchased by Webster Eisenlohr, Inc., had been redeemed by it as authorized by the charter. See note 6 supra. If this has occurred,[9] and I can see no reason to doubt the correctness of counsel's statement, the position taken by the District Judge in making the order complained of is fortified for the provisions of Rule 23(c) of the Rules of Civil Procedure,[10] 28 U.S.C.A. following section 723c, should be deemed to be applicable. While no motion for the compromise, settlement or dismissal of Speese's suit has been filed in the District Court, it is clear that if all of the preferred stock has been purchased or redeemed by the company, the case has in fact been compromised and is ripe for dismissal. The petitioner takes the position that before the provisions of Rule 23(c) become operative, a motion must be made either for a consent judgment based upon a compromise or for dismissal. But the rule insofar as it relates to compromise does not read as the petitioner construes it. It provides that a class suit shall not be compromised without the consent of the court. Read literally, the provisions of the rule are in effect when a class suit has been compromised whether or not the compromise has been submitted to the court. Cf. Piccard v. Sperry Corporation, D.C., 36 F.Supp. 1006, affirmed 2 Cir., 120 F.2d 328. Ordinarily, when a class suit has been compromised the compromise is submitted to the court for approval. This course has not been followed by the parties in the Speese suit and their conduct lends itself to the inference that the compromise will not be submitted by voluntary action of the parties. The petitioner in fact takes the position that the suit has not been compromised. I think that a district court is not required to await a motion to compromise a class suit before investigating the circumstances relating to the compromise for such a motion may never be filed. If the provisions of Rule 23 (c) are applicable under the circumstances presently pertaining to the Speese suit, and I think that such is the case, the court's approval of the compromise is required. If the court is to approve the compromise it is necessary that the court be informed fully as to the circumstances of the compromise. The court, therefore, is entitled to make use of the instrumentality of a master to inform itself in the premises. For these reasons the District Court now is entitled to make an order of reference to a master similar to the order complained of. It follows that the appellate tribunal should not issue a writ of mandamus to compel the District Court to vacate its existing order.

The Speese suit may run through one of five courses: (1) Either party may move the court to approve the compromise. (2) Speese may seek to continue the litigation, asserting that the compromise had been arrived at through the exercise of fraud, collusion or deceit. (3) The petitioner itself, seeking on like grounds to avoid the consequences of the compromise, might endeavor to proceed with the litigation. (4) Speese or the petitioner might move to dismiss the cause on the ground that it had been compromised. (5) If no action is taken by either party, the suit will be dismissed under that rule of the District Court for the Eastern District of Pennsylvania which provides that if no proceeding is taken in a cause for two consecutive years it "shall stand dismissed." The petitioner has stip-

---

[9] The issues presented by the pleadings in Speese v. Webster Eisenlohr, Inc. may or may not have been rendered moot by the company's redemption of all the preferred stock not purchased by it. The question of mootness should be determined by the investigation required by the order of the District Court. Though the class suit has been compromised, if pertinent facts have been withheld from the preferred stockholders by the management of the company or those acting on its behalf, the compromise may be ineffective to dispose of the litigation.

[10] "A class action shall not be dismissed or compromised without the approval of the court. * * * If the right is one defined in paragraphs (2) or (3) of subdivision (a) notice shall be given only if the court requires it."

ulated in this court that it will not move for the dismissal of the Speese suit and it is reasonable to conclude that none of the other courses open to the parties will be pursued by them. We may assume that the suit will stand dismissed at the end of the time prescribed by the local rule. Indeed, Speese's suit, already compromised in fact, is moved toward dismissal by virtue of the local rule.[11] But no matter by what course the suit proceeds or is dismissed, the approval of the District Court is necessary.[12] This would be true even if one or both of the parties sought to set aside the compromise of the class suit, proceeding as suggested under (2) or (3) supra, since a motion to set aside a compromise of a class suit, i. e., to move the court to disapprove it, should be deemed to fall within the purview of Rule 23(c).

In the light of these circumstances is it not an unpersuasive technicality to insist that because the parties to the litigation have made no motion the District Court is without power presently to ascertain the facts upon which its ultimate approval or disapproval of the compromise must be based? For these reasons in addition to those already given under this phase of the case, I conclude that Judge Kalodner presently is entitled to enter an order similar to that complained of. The appellate tribunal, therefore, should not now limit the exercise of his discretion by a writ of mandamus.

The petitioner asserts that the order of reference was made in violation of the requirements of Rule 53(b) of the Civil Rules, in that no exceptional condition required it. Conceding that Rule 53(b) of the present rules is similar in many respects to old Federal Equity Rule 59, 28 U.S.C.A. § 723 Appendix, I think that the conditions demonstrated by the Speese suit were sufficiently exceptional to justify the appointment of a master for the purposes I have indicated. The court below did not have a hearing in respect to the appointment prior to the entry of the order of reference, but an opportunity was given to the petitioner to be heard thereafter and full argument was had before the District Court on June 26 on the motion to vacate the order. This hearing should be deemed to be curative of any defect in the proceeding.

III. The District Court exceeded its powers in one respect. It directed the master to investigate as to whether or not there had been any violation of Rule X–10B–5 of the Securities and Exchange Commission relating to the employment of manipulative and deceptive devices. As is pointed out in the petitioner's brief, the rule of the Commission referred to was promulgated under Section 23(a) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78w (a). The duty of investigation in respect to the violation of its regulations rests within the jurisdiction of the Commission and the jurisdiction and functions of the District Court in respect to violations of the Securities Exchange Act or the regulations of the Commission are prescribed and limited by statute. The function of investigation of violations of the Commission's regulations is beyond the power of the District Court and is not a matter embraced by the controversy presently before it or by any question incidental or ancillary thereto.

I conclude that the portion of the second paragraph of the order of June 9, reading: "the question as to whether or not there was any violation of Rule X–10B–5 'Employment of Manipulative and Deceptive Devices'" of the Securities and Exchange Commission was and is beyond the jurisdiction of the District Court. The rest of the order, however, I think is unexceptionable. Accordingly a writ of mandamus should issue to the District Court directing it to strike out the words last quoted from the order of reference. As to all other parts of the order, the writ should be refused and the rule discharged. The writ of prohibition should be refused and the rule issued in respect thereto should be discharged.

I am authorized to state that Judge McLAUGHLIN concurs in the views expressed in this opinion.

---

[11] Cf. The National Hairdressers' & Cosmetologists' Ass'n Inc., & Charles Deutsch, Inc., v. Philad Co., D.C.Del. 1944, 4 F.R.D. 106.

[12] This is true even though the Speese suit stands dismissed at the end of two years because no proceeding has been taken in the cause. The local rule of court must be applied in the light of Rule 23(c), which is paramount.