WILBURT P. PARKHURST, Plaintiff and Appellant, *v.* NORMAN E. PARKHURST ET AL., Defendants and Appellees.

No. 10847. Argued November 2, 1952.—Decided March 10, 1954.

*McConnell & Valdés* and *Elmer Toro Lucchetti* for appellant. *Héctor González Blanes* for appellees.

MR. JUSTICE PÉREZ PIMENTEL delivered the opinion of the Court.

During many years the Parkhurst Canning Company, a domestic corporation, was engaged in the cultivation, harvesting, canning and sale of pineapple products. Its only stockholders and directors were always Wilburt P. Parkhurst and his two sons, Norman and Charles. Wilburt was always the president of the corporation and Norman and Charles, secretary and treasurer, respectively. The financial condition of the corporation was very poor in the year 1940. Therefore the president took several steps, without success, to negotiate loans with which to carry on. The property of the corporation in that year consisted of two farms situated in Bayamón. One of them, called "Aurora" or "Minillas," was agricultural and devoted to pineapple. The other property was a parcel of 14.4 cuerdas situated in the ward of Hato Tejas, where the cannery was located. Evidently, the corporation did not own any substantial personal property, aside from the value of its trademarks and goodwill.

By resolution of June 24, 1941, the stockholders of the corporation agreed to sell to Norman the "Aurora" farm for the price of $28,000, payable as follows: (*a*) the purchaser would pay off the mortgage of approximately $5,000 in favor of The Federal Intermediate Credit Bank of Baltimore; (*b*) the vendor would repay to the purchaser a debt of $7,000 which the vendor owed the purchaser; and (*c*) the purchaser would pay the balance of $16,000 within 90 days, counted from the execution of the deed of sale. The contract was perfected by deed No. 9 executed on June 27, 1941 before Notary Walter L. Newsom, Jr. Subsequently and within the period agreed upon, Norman paid to the selling corporation the deferred price of $16,000. He also paid off the mortgage to The Federal Intermediate Credit Bank of Baltimore.

At a special meeting held by the directors of the corporation on June 26, 1941, it was unanimously agreed to sell to Norman and Charles the other farm of 14.4 cuerdas located in the ward of Hato Tejas, for the price of $50,000, of which $10,000 had already been paid to the vendor, the balance of $40,000 to be paid as follows: (*a*) $15,000 within 90 days counted from June 27, 1941, and (*b*) the purchasers would assume the obligation to pay a note to the bearer for $25,000 which was secured by mortgage on the farm. The contract was perfected by deed No. 10 executed on June 27, 1941 before Notary Walter L. Newsom. By virtue of this deed, Norman and Charles each acquired an undivided one-half interest of the farm. The purchasers in due time paid to the selling corporation the deferred price of $15,000.

On June 27, 1941, the three stockholders agreed to dissolve the corporation and, since they were also the directors, they continued to act as trustees in liquidation. From and after that date the father and his two sons continued to operate the corporation's business. Subsequently, disagreements arose in 1943 between Norman and his brother Charles, and it was then when, on June 14 of that year, the

former suggested to the latter in writing a partition of their property. By deed executed on September 5, 1943, Norman sold to Charles for $25,000 the "Aurora" or "Minillas" farm which was planted with pineapple. Fifteen days later, and also by public deeds, the Parkhurst brothers transacted the following operations: [1] (1) They cancel, by merger of titles, the $25,000 mortgage which encumbered the property of 14.4 cuerdas, and at the same time they segregate from that farm a parcel of 2.83 cuerdas where a home and a warehouse are built, and (2) Charles sells to Norman for $25,000 his condominia of one-half of both properties which was formerly the farm of 14.4 cuerdas.

On January 8, 1945, by public deed No. 6 executed before Notary Héctor González Blanes, Norman leased to his father the parcel of 2.83 cuerdas, excluding the warehouse, for a period equal to the lessee's lifetime and for a rental of $1 and other considerations which it is unnecessary to recite here.

In September 1948, Wilburt P. Parkhurst filed an extensive complaint in the former District Court of Bayamón against his sons Norman and Charles, their respective wives, the Parkhurst Canning Company and the Crédito y Ahorro Ponceño.

In the first cause of action plaintiff alleges, briefly, that no cause or consideration existed in the two deeds executed by the Parkhurst Canning Company whereby it sold its real property to Norman and Charles Parkhurst; that the sales were simulated, and that the sale contracts as well as the dissolution of the corporation was a fraudulent plan designed and executed in 1941 by defendant Norman Parkhurst, whereby he became the owner of substantially all the properties of the corporation; that, notwithstanding these simulated sales and the dissolution of the corporation, the other corporate properties were neither liquidated nor distributed,

---

[1] These are deeds No. 140 and 141 executed on September 20, 1943 before Notary Francisco Fernández Cuyar.

but the corporation carried on its business uninterruptedly with the properties conveyed until 1943; that on June 27, 1943, and for reasons of health, plaintiff proposed to his sons, Norman and Charles, the partition of the corporate property, to which they agreed, as follows: (a) the net balance would be distributed in equal shares between Norman and Charles after the corporate debts were paid or arrangements were made to pay; (b) that the defendant to whom the cannery would be adjudicated would segregate from the farm on which such cannery is located a parcel of 2.83 cuerdas, and transfer title to plaintiff, and also that defendant would pay to plaintiff during the latter's lifetime the sum of $2,000 annually for his support; and (c) that the defendant to whom the "Minillas" farm should go would pay to plaintiff, for a like period, the sum of $1,000 annually; that Norman and Charles mutually agreed to adjudicate the cannery to the former and the "Minillas" farm to the latter, executing to that effect the corresponding deeds after segregating the parcel of 2.83 cuerdas from the farm where the cannery is located; that plaintiff took possession of the parcel thus segregated and erected his home thereon; that ever since that date plaintiff has urged defendant Norman Parkhurst to transfer to him the title of the 2.83 cuerdas and to pay him $2,000 annually, but the latter, without disclaiming the existence of such obligation, has repeatedly excused himself until January 8, 1945 when plaintiff, lest he should lose what he had invested on parcel, and in view of Norman's refusal to transfer the title to him, accepted a lease for the period of his natural lifetime.

It is alleged in the second cause of action that, Norman's failure to pay the sum of $2,000 annually is equivalent to his refusal to support plaintiff under the provisions of § 590 of the Civil Code, and that, consequently, plaintiff revokes the gift to Norman of the corporate property.

It is alleged in the third cause of action that Norman has been operating the property of the corporation for himself since June 27, 1943, receiving the benefits of its trademarks and goodwill, having received as fruits of such operation a sum exceeding $500,000 which belongs to the corporation, whose only stockholder is plaintiff. It is requested that Norman render the corresponding accounts.

It is alleged in the fourth cause of action that the corporation has not been liquidated and that its property is under the control of one of its trustees, namely, Norman Parkhurst, who has violated his obligations as trustee because (a) he has transferred the cannery without cause or consideration; (b) has taken possession and made use, for his personal benefit, of the goodwill, the trademarks and other property of the corporation, having used such property to conduct a business for his exclusive personal benefit.

The complaint ends with a lengthy prayer. It is substantially prayed that the court render judgment containing the following pronouncements: (1) that plaintiff be declared the owner of all the shares of stock of the Parkhurst Canning Co.; that the shares appearing in the name of Norman and Charles be canceled, and that the latter be directed to deliver to plaintiff the books, accounts, papers and records of the corporation, as well as all the corporate chattels and property; (2) that deeds No. 10 of June 27, 1941, executed before Notary Walter L. Newsom, Jr., and Nos. 140 and 141 of September 20, 1943, executed before Notary F. Fernández Cuyar, be avoided; (3) that defendant Norman be directed to render accounts for the operation of the cannery; (4) that Norman and Charles be directed to render accounts as trustees in liquidation of the corporation, and to deliver to plaintiff the corporate property, with the exception of the "Minillas" farm, after paying off the debts and obligations; and (5) that plaintiff be afforded any other relief at law.

Norman E. Parkhurst and his wife filed an answer.[2] Regarding the first cause of action, they accepted some facts and denied others. They elaborated on the nature of the different transactions carried out between defendants and plaintiff, alleging that such transactions were made for cause and consideration; that in 1943 plaintiff withdrew from the business which he had carried on with his two sons after the dissolution of the corporation, when the final liquidation was made, and plaintiff withdrew the full amount of his debt; that by so doing plaintiff altered the original plan which he had proposed to his sons in 1941, to the effect that the latter would pay him an annuity of $1,500 and would lease to him, for his natural lifetime, the parcel of 2.83 cuerdas, in view of the fact that it was impossible to pay him in cash a certain debt which the corporation owed him.

The essential facts of the second, third and fourth causes of action were also denied. They alleged as defense that the complaint did not state facts sufficient to constitute a cause of action and that the action had prescribed.

After a trial on the merits, the lower court entered judgment dismissing the complaint in its entirety and ordering plaintiff to pay the costs and the sum of $1,000 for attorney's fees.

Plaintiff took this appeal from that judgment, assigning five errors. Before discussing these errors, we will sum up the findings of fact of the lower court. The issues involved in this case are summed up by that court as follows:

"The two most important propositions arising from this action are:

"First, whether or not undue influence was exercised in the execution of the two deeds of sale of June 27, 1941, whereby the Parkhurst Canning Co. transferred the only two real properties owned by it at that time (consisting of the 'Aurora' farm

---

[2] Default was entered against the other defendants, with the exception of the Crédito y Ahorro Ponceño, which was never summoned, nor was any relief sought against it.

and a certain parcel of 14 cuerdas where the structures used in the fruit and juice canning industry were located.) The former property was sold to Norman E. Parkhurst and the second, namely, the parcel of 14 cuerdas where the cannery is located, to the latter and to his brother Charles, each taking an undivided one-half interest.

"Second, whether or not, after the dissolution of the corporation, the trustees in liquidation proceeded to liquidate and distribute the corresponding corporate capital

"The other issues to be decided stem from plaintiff's claim to certain private concessions which were allegedly established in his favor as a result of the liquidation of the corporation, and on the authority of some alleged agreements between him and the defendants. In this connection, it is incumbent on the court to decide: (1) whether or not there existed some sort of a contract between plaintiff and defendant Norman E. Parkhurst, whereby the latter bound himself to pay to the former an annuity or pension of $2,000 for his support, and (2) whether Norman E. Parkhurst further bound himself to execute a title in fee simple to a certain parcel of land (2.83 cuerdas) which was leased to plaintiff in 1945.

"In support of his contentions, plaintiff challenges the genuineness of a series of operations contained in public documents executed before Notaries Walter L. Newsom, Jr., Enrique Córdova Díaz, Francisco Fernández Cuyar, H. González Blanes and Gaspar Rivera. Cestero. The first of these attorneys was also the attorney for the corporation."

As to deed No. 9 executed June 27, 1941 before Notary Walter L. Newsom, Jr., whereby the Parkhurst Canning Company sold to defendant Norman E. Parkhurst the "Minillas" farm for the price of $28,000, the lower court concluded that that sale was made for a cause certain and without undue influence on the part of the purchaser; that the corporation formally agreed to carry out the sale and instructed its president, plaintiff and appellant herein, to execute the corresponding deed; that the corporation owed to Norman the sum of $7,000, which was included as part of the selling price; that Norman assumed, in the name of the corporation, the payment of a mortgage debt for 5,000 in

favor of The Federal Intermediate ˙Credit Bank of Baltimore, the balance of which was received by the latter according to deed No. 68 executed on August 21, 1941 before Notary Enrique Córdova Díaz; that Norman contracted a personal debt with The Federal Land Bank in the sum of $16,000. with which he paid the deferred price to the vendor, the Parkhurst Canning Co., as acknowledged by the latter in public deed No. 67 executed before Notary Enrique Córdova Díaz; that the price paid by Norman is substantially greater than that paid by the corporation for the farm in question in 1937.

The lower court also concluded that deed No. 10 executed June 27, 1941 before Notary Walter L. Newsom, Jr., whereby the Parkhurst Canning Co., sold to Charles and Norman Parkhurst the farm of 14 cuerdas where the cannery was located, was executed for cause or consideration, and that the sale was not simulated, nor had undue influence been exercise in its execution; that the $10,000 debt of the corporation in favor of Charles and Norman, which the former accepted as part of the selling price, was a legitimate debt according to the books of the corporation and was acknowledged by plaintiff himself at the trial; that the purchasers paid to the corporation the deferred price of $15,000 and also assumed payment of a mortgage obligation of $25,000 in favor of The Royal Bank of Canada, to secure a debt of the corporation for $29,983.60, as disclosed by the balance sheets presented by its treasurer, Charles W. Parkhurst.

The trial court further concluded that the liquidation and partition of the corporate property existing at the time of the dissolution was made in the latter part of 1943. Regarding the transfer of the title of the parcel of 2.83 cuerdas and the annuity agreed upon in plaintiff's favor, the court stated as follows:

"(10) The court is 'of the opinion that before the liquidation was made plaintiff desired to obtain the usufruct of a parcel of land, consisting of about 2.83 cuerdas, situated on lands of the factory, where he had his residence, and that such concession was finally granted by defendant Norman E. Parkhurst, who became the owner of the entire property upon purchasing from Charles and his wife their one-half share. The court has believed the evidence bearing on plaintiff's interest in the use of that portion of land for the purpose of erecting a house thereon, as well as on the evidence touching the lease contract for a period equal to plaintiff's lifetime, executed in 1945 before Notary Héctor González Blanes, whereby the agreement in this respect made by the former and his son Norman was perfected. The court disbelieved the existence of an agreement transferring title in fee simple of the parcel to plaintiff.

"(11) This court also finds the following: that in 1941 the properties were heavily encumbered, it being difficult to determine, judging by the poor financial condition revealed by the evidence (including the balance sheets for that year offered in evidence), whether the value of the property was sufficient to answer for the amount of its obligations; that there was no money in cash; that the corporation sustained a loss that year, it being problematical whether or not it could have subsisted, wherefore they agreed to the dissolution. The court believes that, in view of such circumstances, all the stockholders devised a plan whereby the property, encumbered as it was, would be sold by the corporation to Norman E. Parkhurst and Charles W. Parkhurst, under the onerous conditions set forth in deed Nos. 9 and 10 executed before Notary Walter L. Newsom, for the further purpose that, once the corporation was dissolved, the property acquired and the corporate business liquidated, plaintiff's sons could possibly carry on the business. The court believes that plaintiff at that time planned to request his sons, after they purchased the encumbered property and assumed control of the business in such bad condition, to give him an annuity, in addition to the usufruct from a smaller parcel of land (2.83 cuerdas) located on lands of the factory. The court is further of the opinion that, it having been proved that at that time, and in view of the prevailing state of affairs, plaintiff alleged that the corporation owed him an interest which plaintiff believed was worth approximately $23,435.15, and that it was in payment of this interest (which it was known could

not be paid by the corporation because it had no funds) that he claimed from his sons an annuity or pension. It was the purpose, in the beginning, to fix that annuity or income at a certain smaller sum and finally at $3,000 annually. The court concludes, however, that this proposed agreement, which was under consideration by plaintiff and which defendants Norman E. Parkhurst and Charles W. Parkhurst were willing to accept in principle, was never perfected. Plaintiff had this agreement in mind sometime before the liquidation, namely, from 1941 to 1943; however, in the latter year plaintiff, realizing that the earnings were increasing unexpectedly, used the benefits for himself and, instead of the annuity which he proposed to ask for, elected to withdraw, and did withdraw, his share or interest in cash, besides other additional amounts which it was easy for him to appropriate since he had the control of the funds. The proposed annuity plan was thus abandoned and plaintiff felt satisfied."

■■ We turn now to discuss the assignments of error made by plaintiff-appellant. The secretary of the court having entered the default of all the defendants, with the exception of the Banco Crédito y Ahorro Ponceño, which was never summoned, plaintiff prayed for judgment by default as respects the first and second causes of action, and, as to the other two causes of action, for an order appointing a master pursuant to Rule 55 of the Rules of Civil Procedure, "in order that said master may fix the statement of accounts mentioned in the third and fourth causes of action." Subsequently, the secretary of the court having been advised that defendants Norman E. Parkhurst and his wife Lavinia Mitchell Parkhurst were not in default, since they filed a motion to dismiss in due time, set aside the entry of default of these defendants. After a hearing was held, the lower court overruled plaintiff's motion for judgment by default and for the appointment of a master. Thereupon defendants Norman and his wife filed their answer to the complaint. Later on, the plaintiff again moved for the appointment of a master and once again the court overruled his request. Appellant contends in the second assignment that

the lower court erred and abused its discretion in refusing to appoint a master.

This error was not committed. Rule 53 of the Rules of Civil Procedure invoked by appellant provides that the court in which any action is pending may appoint a special master. The Rule also provides that the reference to a master shall be the exception and not the rule, and that in any action, except in matters of account, a reference shall be made only upon showing that some exceptional condition requires it. Furthermore, the court may specify or limit the powers of a master to such a degree that his mission is merely to receive and report evidence. Rule 53 (c). The mere fact, however, that an accounting may be necessary is not enough to justify the appointment of a master. It must appear that the matter is complex and would take an undue amount of the court's time. *Barrick* v. *Pratt*, 32 F. 2d 732; V Moore's *Federal Practice*, p. 2939. On the other hand, a master is appointed only to help the court in a case where help is needed. His appointment and activities are only for the purpose of assisting the court to get facts and arrive at a correct result in complicated litigations. *Webster Eisenlohr, Inc.* v. *Kalodner*, 145 F. 2d 316, cert. den., 325 U. S. 867. One of the questions to be decided in the instant case was whether or not the liquidation and partition of the property was carried out. If this question is decided in the affirmative, as was actually done by the lower court, the appointment of a master, on the grounds alleged by plaintiff in his motion, was not in order. Furthermore, it appears from the record that prior to the trial plaintiff requested and obtained an examination of all the papers which defendant Norman Parkhurst had in his possession, and that during the trial plaintiff had ample opportunity to offer all the evidence he would have wanted to produce before the master. As correctly alleged by the appellee, "the fact that it was the lower court itself which intervened, instead of any master

to which the court might have delegated such power, does not operate against its superior standing to take cognizance of this matter, nor does it actually constitute a ground to raise inferences favorable to plaintiff. On the contrary, the direct intervention of the court logically impresses the judicial investigation with greater solemnity and guaranty . . . There is nothing to show that they (plaintiff and his son Charles) could have offered better, nor any additional, evidence than that produced before the lower court."

■ The third and fourth errors may be discussed jointly. Appellant assigns them as follows:

"Third Error: The lower court erred in deciding, as a question of fact and of law, that the corporation was fully liquidated.

"Fourth Error: The court erred in not ordering the restoration of the corporate property and in not directing the trustees in liquidation to render accounts on the liquidation."

The finding of the lower court to the effect that the distribution and liquidation of the corporate property existing after the dissolution of the corporation was executed in 1943, finds support not only in the evidence offered by defendant Norman, which the court fully believed, but also in part by the testimony of plaintiff himself and of witness Charles Parkhurst. Almost at the end of the direct examination, plaintiff testified that in 1943 he reached an agreement with his two children whereby the latter would pay him a pension of $3,000 annually and would give him dominion title to the parcel of 2.83 cuerdas; that he did not receive a single penny from the thirty or forty thousand dollars appearing in the inventory, by which he meant that he received nothing when the property of the corporation was transferred. However, at the beginning of the cross-examination he testified as follows:

"Q.—Did you receive any money?

"A.—I received the money from the partition made among the three of us, but nothing from the value of the property."

Regarding the partition of the corporate property in question, witness Charles Parkhurst testified as follows:

"Q.—Then, according to your theory, a partition was made in good faith among the three of you in 1943?

"A.—Yes, sir.

"Q.—So, all the property was divided according to that agreement made in 1943?

"A.—Yes, in 1943.

"Q.—Was a bona fide partition made on that occasion?

"A.—Yes.

"The Court:

"Q.—Then the condition of the business was good?

"A.—Yes, sir.

"Q.—Then, why did you decide to make the partition?

"A.—Because I did not want to work with my brother; we had disagreements and he was causing me untold suffering.

"Defendants:

"Q.—How much did you receive in cash in 1943?

"A.—Well, very little.

"Q.—How much, more or less?

"A.—May I look at the note I have with me?

"Q.—Are you speaking of the time when the liquidation was made in 1943?

"A.—Yes. That was the question you made. I received $37,684.27.

"Q.—Is that what you call very little?

"A.—Because I received at that time $20,000 in cows, and I do not recall the amount my brother gave me in cash, since he still owed me some money.

"Q.—Don't you have that on your note?

"A.—No, he owed me $10,000 and paid me $6,000, and still owed me $4,000 until June 1944, or one year later.

"Q.—Did you receive your full share?

"A.—Ultimately I did."

On the other hand, the evidence shows that in 1941, when the real property was sold to Norman and Charles, the corporation owed plaintiff the sum of $23,000, a debt which had been carried forward on the books until 1943. According to defendant Norman's testimony, on which the trial court

placed full credence, when the distribution of the corporate property was made in the year 1943, plaintiff decided to change the original plan which he had proposed to his children, whereby the latter, in exchange for his interest of $23,000, would pay him an annuity, and elected instead to withdraw, and did withdraw, his interest in cash in the sum of $42,000. Part of this sum, as disclosed by the documentary evidence, accrued from the proceeds of the sales made in the United States. In order to adjudicate to himself the proceeds from those sales, plaintiff instructed the Corn Exchange National Bank & Trust Company and other continental firms to deposit in his private account in the United States the amounts collected from shipments. By the adjudication of the $42,000, plaintiff received payment of the $23,000 debt plus his share in the business which he and his children continued to operate after the dissolution of the corporation.

The evidence likewise supports the findings of the lower court to the effect that the sales of the only real property owned by the corporation were made for cause or consideration, and that such sales were not a part or a fraudulent plan, as alleged by plaintiff, carried out by Norman to appropriate for himself all the property of the corporation. After a careful examination of the transcript of the evidence and the findings of fact and conclusions of law announced by the trial court, we accept as correct the observations made by appellee in his brief on those transactions, to wit:

"It was an admitted fact that at the time the sales in question were transacted, the corporation owed to Norman and Charles Parkhurst the sum of $10,000 (Tr. of Ev., pp. 107 and 108.) It was also established that the corporation owed Norman in particular the sum of $7,000 (Tr. of Ev., pp. 106, 145.) Plaintiff himself acknowledged the existence of such credits in favor of his sons Norman and Charles in the deeds executed by himself before Notary Newsom in the name of the cor-

poration. (Tr. of Ev., pp. 162 and 189.) It was further established that the corporation not only agreed to sell the real property but that the sales were actually carried out. As to the 'Aurora' farm, it was established that defendant Norman Parkhurst purchased the same for the sum of $28,000, which he paid as follows: $7,000 which he admitted the corporation owed him; $5,000 which he reserved to pay off the balance of a debt incurred by the corporation with the Intermediate Credit Bank of Baltimore, secured by a mortgage on the real property for the sum of $12,000, which amount was paid and the lien canceled by the bank by public deed executed before E. Córdova Díaz (Tr. of Ev., p. 239); and $16,000 which defendant paid to the corporation within a period of 90 days, as acknowledged by the latter by resolution and by deed No. 67 of August 20, 1941 before E. Córdova Díaz (Tr. of Ev., p. 171.) The receipt for that payment issued by the treasurer was presented, without objection (Tr. of Ev., p. 42.) In the sale of the other real estate, made by deed No. 10 of June 27, 1941, executed before Newsom (Tr. of Ev., p. 180), in addition to the fact that it was plaintiff himself who appears once again on behalf of the corporation, payment of the price was agreed upon and made as follows: The corporation acknowledged a debt in favor of Norman and Charles in the sum of $10,000 (that debt is shown on the books of the corporation and was proved at the trial (Tr. of Ev., pp. 107 and 108); $15,000 which they agreed to pay, and did pay, within 90 days. The receipt for payment of this amount was accepted at the trial (Tr. of Ev., pp. 80 and 81.) In addition to the foregoing, appellant himself appears in public deed No. 139 executed September 20, 1943 before Notary F. Fernández Cuyar, ratifying the sale, for the purpose of acknowledging, as trustee in liquidation at this time, the payment of the deferred price. They reserved the sum of $25,000 to pay to the bearer a mortgage note for that amount which encumbered the property. This note was honored and canceled by deed No. 140 executed September 20, 1943 before F. Fernández Cuyar, whereupon Norman and his wife purchased from Charles and his wife their share by deed No. 141 executed the same day before the same Notary (Tr. of Ev., pp. 215 and 225). On October 11, 1943, the former executed another mortgage, for a like sum of $25,000, before Notary H. González Blanes, who, together

with Lic. F. Fernández Cuyar, also appeared therein as counsel for the Crédito y Ahorro (Tr. of Ev., pp. 62 and 63).

". . . . . . . .

"But there is more, as stated by the lower court, for even though there was no consideration stated in the deed, there actually was consideration. Since it is unquestionable that the purchasers took over the liens which encumbered that real property and that they actually made the payments, there would always be sufficient consideration at law. See *García* v. *Central Alianza, Inc.,* 69 P.R.R. 855; Manresa, *Comentarios del Código Civil Español,* Vol. 8, 2d Ed., 1907, p. 679."

In view of the above, we need not consider, as not being in order, the *constructive trust* rule invoked by appellant in his brief. The findings in this case do not admit of the application of that rule.

In view of the conclusion to be reached by us, we need not discuss either the defense of prescription raised by defendant.

█ The third and fourth errors were not committed. Neither was the first error. It is alleged in the latter that the trial court was moved by passion, prejudice and partiality. No such thing appears from the record. Neither the incidents that occurred during the trial and alleged by appellant in support of this error, nor the statements made by the court in its conclusions regarding plaintiff's attitude and conduct, are sufficient to support that assignment.

█ In the fifth and last error appellant challenges the award of the sum of $1,000 for attorney's fees. He contends (1) that the lower court did not make any finding of fact or conclusion of law regarding plaintiff's obstinacy, and (2) that the work and time spent in the litigation does not warrant the award of such a substantial sum.

Although the word "obstinacy" is not used in the judgment, it may be logically assumed that the lower court ordered plaintiff to pay the attorney's fees because it considered that he had been obstinate. *Font* v. *Pastrana,* 73 P.R.R. 238. In the instant case, as in the *Font* case,

such a conclusion is implicit since the terms in which the opinion is couched disclose it. On the other hand, the record discloses that the amount awarded is reasonable. The error was not committed.

The judgment appealed from is affirmed.