Bailey et al., Appellants, *v.* Jacobs.

Short et al., Appellants, *v.* Jacobs.

Argued November 27, 1936.  Before KEPHART, C. J., SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

Henry S. Drinker, Jr., of Drinker, Biddle & Reath, with him Edwin A. Lucas and George P. Orr, of Orr, Hall & Williams, for appellants.

Frederic L. Clark, with him Everett H. Brown, Jr., of Shields, Clark, Brown & McCown, for appellee.

OPINION BY MR. JUSTICE STERN, January 11, 1937:

The thousand page record in these equity proceedings is replete with intricate facts, extensive exhibits, complicated financial reports of expert accountants, and nearly three hundred requests for findings of facts and conclusions of law. There are so many transactions involved—some vital, others incidental to the principal issues—that not even a bare summary can be given within the limits of a judicial opinion. The suit is brought by a number of shareholders of a corporation to compel defendant, its president, to account for profits made through his personal use of corporate assets. The testimony portrays a story of financial transactions by defendant which are more remarkable for the ingenuity they reveal than acceptable as models of ethical propriety. The chancellor found them to be wholly reprehensible, but held that recovery as to some of them was barred by the statute of limitations. The court in banc held that all were so barred, and dismissed the bill.

The original Philadelphia Paper Manufacturing Company was a corporation engaged in the manufacture of boxboard. The Fibre Container Company, which manufactured boxes, was one of its customers, and in 1923 these two merged into a new corporation, retaining the

name of Philadelphia Paper Manufacturing Company, with an authorized capital stock of 67,500 shares, par value $50, of which 63,295 were outstanding. Defendant owned 3,950 of these shares, making his interest in the company approximately 6.25%. The largest stockholder was his aunt, Mrs. Carrie Jacobs Brown, who held 25,725 shares; other members of his family owned 3,575 shares; the remainder of the stock, approximately one-half, was divided among a large number of shareholders. Defendant had been president and director for many years of both the old Paper Company and the Fibre Container Company, and he became president and director also of the new corporation. Its business was extremely successful, paying large dividends from year to year, and in 1925 and 1926 it had net assets of a book value of well over five million dollars.

In 1921 occurred the first transactions which are the subject of attack in these proceedings. Defendant carried a personal account on the books of the Paper Company, and during all the years from at least as early as 1921 to 1927 was continuously[1] indebted to it in sums ranging from several thousand to nearly half a million dollars. On March 4, 1921, he took $10,000 of the funds of the company and with it purchased some patents and patent rights; on August 31, 1921, he withdrew $2,700 more, and, with $300 previously taken from the Fibre Container Company (to which he was also chronically indebted in large sums), he bought certain machinery, equipment and additional patent rights. The assets thus purchased with money belonging to the two companies of which he was president were transferred by him to a Delaware corporation which he organized, called Fi-Bo-Pak Company, and in return he received the entire capital stock of that company, consisting of 1,000

---

[1] Except for a week in December, 1921, and the month of May, 1925.

shares, par value $100, and two notes aggregating $45,-000.[2]  Subsequently the authorized capital stock was increased to 100,000 shares of no par value, and the name of the company was changed to Boxboard Products Company.  Of the increased capitalization defendant, in 1925 and 1926, held 38,000 shares,[3] of a total of 53,135 outstanding.  The Boxboard Company was not a successful enterprise.  The Paper Company, no doubt through the influence of defendant, advanced to it from time to time large sums aggregating approximately $125,000, but was compelled to write off this entire amount on January 1, 1925, as a bad debt.  In March, 1926, its cash and accounts receivable amounted to only $2,004.05, and its machinery and equipment to $1,880.27.

It will be noted that in the Boxboard Company, with its meagre resources, defendant owned about 72% of the stock, as contrasted with his 6¼% interest in the affluent Paper Company.  Defendant conceived the plan of a merger between the two companies, and in furtherance thereof steps were taken to impress the stockholders of the Paper Company with the desirability of such action.  A dividend of $54,901.88 was declared by the Boxboard Company, although its operations had never shown a profit from which a dividend could be paid.  Its authorized capitalization was increased to 190,000 shares, of which 70,000 were 7% cumulative preferred stock, par value $50, and 120,000 were common shares of no par value.  A letter was sent to the Paper Company's stockholders, signed by defendant, stating that "The members of your Board of Directors have for sometime been watching the Boxboard Products Company very closely, and lately have been negotiating informally with the end in view of effecting a close connection whereby the stockholders of the Philadelphia Paper

---

[2] Defendant indorsed these notes over to the Paper Company.

[3] He originally held 50,000 shares, but assigned 12,000 of them to M. R. Kondolf.

Mfg. Company would benefit by the exploitation of the numerous patents, license agreements, etc., which the Boxboard Products Company owns." Then followed a quotation from a letter alleged to have been received from the Boxboard Company setting forth a flattering statement of its prospects. There was added a copy of a resolution of the board of directors of the Paper Company recommending to its stockholders the exchange of each share of their stock for one share of preferred and one share of common stock of the Boxboard Company. Numerous additional representations were made as to the alleged desirability of the exchange and the need for immediate action if the deal was to be consummated. No information was furnished or intimated that the Boxboard Company and defendant were practically identical, or as to the actual financial status of that company, or that defendant then held 38,000 shares of its stock which would prorate with the stock to be issued for that of the Paper Company.

Comment is scarcely required to characterize this transaction. The merger was consummated on March 23, 1926. The stockholders in the Paper Company assigned their stock to the Boxboard Company, which thereby became the sole shareholder and owner of the Paper Company. The Boxboard Company delivered 63,-295 shares of its preferred stock and an equal number of shares of its common stock for the 63,295 shares of stock of the Paper Company, the outstanding common stock of the Boxboard Company being thus increased to 116,430 shares. By the simple expedient of the merger defendant changed his 6.25% interest in the Paper Company to one of 36%.[4] On his original 38,000 shares of the Boxboard Company defendant afterwards realized a profit of nearly one million dollars.

Plaintiffs contend that this profit, in justice and in law, belongs to the stockholders of the Paper Company,

---

[4] Subject to the preferred stock of the Boxboard Company.

first, because the Boxboard Company stock from which it was derived was obtained by defendant for property purchased with the Paper Company's money, and, second, because defendant, as president and a director of the Paper Company, would have had no right, even with his own money, to buy for himself patents necessary or highly advantageous to the business of the corporation, but could lawfully acquire them only for the company's benefit.

The principles relied upon by plaintiffs to establish this position are fundamental and well established. Indeed, upon them rests the entire structure of the law of corporate administration. Directors and officers occupy toward stockholders what is commonly characterized as a fiduciary relationship. They must act in the utmost good faith, and cannot deal with the funds and property of the corporation, nor utilize the influence and advantage of their offices, for any but the common interest. If they make a personal profit through the use of corporate assets they must account for it to the stockholders. It is immaterial that their dealings may not have caused a loss or been harmful to the corporation; the test of liability is whether they have unjustly gained enrichment. Public policy demands the formulation and enforcement of these standards, the wisdom of which is readily apparent. Nor will the law permit a fiduciary to place himself in a position which invites conflict between self-interest and integrity. Both because defendant made profits from his personal use of the corporate funds, and because the patents and patent rights purchased by him were highly desirable for the Paper Company's purposes, he must account accordingly. That the patents would have been extremely advantageous to the business of the Paper Company is a fact which defendant is estopped to deny. Under his administration the Paper Company devoted the sum of approximately $125,000 to their development in the hands of the Fi-Bo-

Pak Company. Moreover, he himself pictured to the stockholders of the Paper Company the great benefits which would accrue to it from their acquisition.

Interesting discussion of the legal principles governing this phase of the present controversy are to be found in *Farwell v. Pyle-National Electric Headlight Co.,* 289 Ill. 157, 124 N. E. 449; *Bromschwig v. Carthage Marble & White Lime Co.,* 334 Mo. 319, 66 S. W. (2d) 889; *Balch v. Investors' Royalty Co.,* 7 Fed. Supp. 420; *Backus v. Finkelstein,* 23 Fed. (2d) 357; *Bird Coal & Iron Co. v. Humes,* 157 Pa. 278.

It being clear, then, that defendant was bound to account to the Paper Company for the value of the 38,000 shares of Boxboard Company stock and the profits which he ultimately realized therefrom, the real question in the case is how long this liability existed. Defendant's appropriation of the $13,000, the purchase of the patents, and their transfer to the Fi-Bo-Pak Company in return for its issue of capital stock, all took place in 1921; his realization of profits from the stock occurred in 1926 and 1927. At the latest, therefore, any claim in regard to these transactions was barred by the statute of limitations after 1933.[5] The present suit was started in January, 1934. The withdrawal of the $13,000 from the company had been noted on its books at the time of its occurrence. There was no independent act of fraud or concealment in regard to it, nor to the organization of the Fi-Bo-Pak Company, preventing or deterring investigation on the part of plaintiffs, which, under familiar authorities, would operate to toll the statute until actual discovery. Plaintiffs' claim has been brought too late for relief to be granted, however justly they

---

[5] Even if the statute does not bind a court of equity, the latter will usually adopt and apply it to corresponding rights and remedies by way of analogy to proceedings at law: *Dalzell v. Lewis,* 252 Pa. 283, 287; *Sullivan v. Sullivan,* 74 Pa. Super. Ct. 396, 399.

might otherwise have been entitled to it. The same is true in regard to defendant's acts in connection with the merger between the Paper Company and the Boxboard Company. Whatever may have been the misrepresentations and lack of proper explanations which induced the stockholders of the Paper Company to suffer a dilution of their interests in the assets of their company by merging with the Boxboard Company, plaintiffs cannot recover in 1934 for wrongs committed in 1926, unattended by any other acts aimed or serving to divert plaintiffs from obtaining a knowledge of the facts and pursuing a remedy to vindicate their rights.

This brings us to the consideration of a series of transactions by defendant which are the principal subject of attack in the present proceedings, consisting of the withdrawal by him, on a large scale, of funds of the Paper Company and their use in the purchase of stock of other shareholders upon which he subsequently made enormous profits. On April 20, 1925, he withdrew from the company the sum of $90,000 and used it for the purchase of 2,000 shares of Paper Company stock from Elizabeth A. Harter. On June 2, 1925, he withdrew $230,-375, with which he purchased 4,750 shares from G. A. Bisler. On June 22, 1925, he withdrew $600,000, and with it bought 12,862 shares from his aunt, Carrie J. Brown. On October 5, 1925, he withdrew $500,000, with which, together with $100,000 of other money, he purchased an additional 11,863 shares from Carrie J. Brown.[6] On June 9, 1926, he took $300,000 and used it for the purchase of 5,000 shares of common and 5,000 shares of preferred stock of the Boxboard Company (the merger at that time having been effected) from the Charles T. Colladay Estate. On June 11, 1926, he withdrew $40,000, which was used in the purchase of 415

---

[6] The purchase was of 12,863 shares, but he transferred 1,000 shares to W. G. Carey, Jr., at cost price.

shares of common and 415 shares of preferred stock of the Boxboard Company from Mary S. Colladay and 210 shares of common and 210 shares of preferred of that company's stock from Margaret C. McCreery.[7] Plaintiffs ask, on the basis of the principles hereinbefore discussed, that defendant be compelled to account for the profits realized by him from these transactions.

The first question that arises is the extent to which the withdrawals represented funds of the Paper Company, as distinguished from money actually due defendant from that company. At the respective times when he took the $90,000, the $300,000, and the $40,000, he was considerably in debt to the company, and those items undoubtedly constituted corporate funds. In the case of the $230,375, the company's books at that time also showed a large balance due by defendant. It appears, however, that he had deposited funds with the company not entered upon the books. On the other hand, as previously pointed out, an indebtedness of defendant to the company then existed of the value of the 38,000 shares[8] of Boxboard Company stock for which defendant was obliged to account, the statute of limitations not barring this indebtedness until several years thereafter. At the annual meeting of the Boxboard Company's stockholders on January 20, 1925, defendant stated that he had received an offer "from an outside source" of $10.00 per share for the stock of that company, and said "it would undoubtedly be possible to sell at this figure"; none of the stockholders would accept

---

[7] There is ground to support the belief that in the purchase of at least some of the stock defendant was acting with knowledge of an extremely favorable offer for the assets of the company made on behalf of the Container Corporation of America, and which had not yet been revealed to the stockholders.

[8] Defendant had held 12,000 more shares which he transferred to M. R. Kondolf, but the record does not disclose what, if any, consideration he received therefor.

the offer. This was the price at which the Paper Company bought 250 shares from M. R. Kondolf on July 11, 1925.

On the basis of such realizable value[9] defendant's indebtedness to the company for the 38,000 shares was $380,000, and taking cognizance of this item in the account between defendant and the Paper Company, as well as the items of defendant's deposits, the result is that, when the $230,375 was withdrawn, defendant had a credit balance of $39,141.13; all of the withdrawal beyond that sum was money belonging to the company. Taking the same items into consideration in connection with the $600,000 withdrawal, defendant had no credit balance with the company at that time, but, on the contrary, was heavily indebted to it. In regard to the $500,-000 withdrawal on October 5, 1925, it appears that defendant was then indebted to the company in a sum exceeding $100,000. It is true that on the same day he gave to the company his check for $500,000, but not only did the withdrawal precede the deposit, but the latter was made possible only by his obtaining a loan on the collateral of the stock which he purchased with the money withdrawn from the company. Apart from that fact, when effect is given to the indebtedness for the 38,000 shares of the Boxboard Company, as previously discussed, defendant would have had but a negligible balance with the company even were the deposit of $500,000 credited to his account as contemporaneous with the withdrawal by him of that amount from the company.

Defendant presents several contentions to refute plaintiffs' assertion of his liability arising from these transactions: (1) That in most instances he restored the money within a few days; he kept and used the company's funds only for short periods. Obviously this

---

[9] Subsequently defendant actually realized $26.09 per share on this Boxboard Company stock.

defense is without merit. Not only were most of the payments not applied to specific withdrawals, but even when made they left a practically continuous balance owing by defendant to the company. Moreover, the law makes no discrimination with regard to the length of time an officer or director uses corporate property for personal purposes. To approve such a distinction would be to emasculate the principle upon which liability is based, and to open the door to abuses which would deprive the rule of its salutary effect and render it practically abortive. It would permit an officer or director to speculate with funds of a corporation and, if successful, promptly restore the money to the corporation with impunity. The rule is designed to destroy temptation, not merely to recover a loss that may be suffered by the company.

(2) That the Paper Company was a "family affair" and therefore the situation is different from that of an ordinary corporation. Even were this otherwise a valid defense, the fact is, as already stated, that about half of the company's stock was held by persons not members of defendant's family.

(3) That defendant had financial resources of his own, and was not compelled to use the company's funds in order to obtain money for his stock purchases. He intimates that his only object was to save himself the brokerage cost of selling his securities. But if even grim necessity would not have legally justified the withdrawal of company funds, how much less the excuse offered by defendant.

(4) That "loans" of the company's funds were made to other officers and directors, constituting a "general practice." With respect to the rights of stockholders such a practice would be unjustified, and an illegal withdrawal by one officer or director would not be validated because others committed similar wrongs. The fact is that the "loans" to other persons not only were all recorded on the books of the company (which was not

true of several of the withdrawals by defendant), but they were comparatively negligible in size, amounting to a few hundred, or at best a few thousand, dollars as against defendant's large continuous indebtedness with withdrawals aggregating millions of dollars. Moreover, there is a distinction between overdrafts of small amounts as advances against salary or other credits to accrue to an officer or director, and the abstraction of sums, not claimed to be due or applicable against future likely credits, but solely for personal use in the pursuit of speculative or other purposes.

(5) That the board of directors of the Paper Company ratified the withdrawals. In 1926 one of the directors of the Boxboard Company having charged defendant with taking the Paper Company's moneys, a committee was appointed on behalf of both companies to investigate the charges. An audit was conducted of the books and accounts, and report made to the directors. Upon defendant expressing his willingness to pay interest retroactively, the board of directors of the Paper Company passed a resolution on October 15, 1926, ratifying the "loans" then outstanding, and the boards of both companies on November 3, 1926, passed resolutions ratifying all the transactions set forth in the auditors' report. As the court below properly held, this "ratification" was invalid, because the directors could not ratify what they could not originally have authorized. They had no authority to permit the moneys of this company, contributed by the stockholders to a manufacturing enterprise, to be used in huge amounts by the president at will for his own financial purposes. The transactions were obviously in furtherance solely of defendant's interests, and could not be of benefit to the company. Only if all the stockholders consented could any binding ratification be given to the use by defendant of the company's funds: Fletcher, Cyclopedia of Corporations, Vol. 3, section 1104.

(6) That whatever claims plaintiffs originally could have maintained arising from defendant's use of corporate funds are barred by the statute of limitations. The withdrawal of $300,000 on June 9, 1926, and of $40,000 on June 11, 1926, were concurrently entered on the books of the Paper Company, and therefore the same observations apply to those items as to the withdrawal of $13,000 in 1921 for the purchase of patents. The profits made therefrom by defendant properly belonged to the company, but the right of recovery has been lost by the lapse of time. As to those items there was no act of concealment or fraud additional to the transactions themselves and therefore nothing to prevent the running of the statute.[10] The other withdrawals, however,—those of $90,000, $230,375, $600,000 and $500,000—were not entered upon the books of the company. While there is no testimony that this concealment was the result of any direct order of defendant to the bookkeeper, there was evidence justifying a conclusion that defendant at least made a suggestion to that effect, and that he knew the withdrawals were not being noted upon the books, for he received monthly statements, taken from the ledger, of the financial affairs of the company which showed the absence of such entries. This concealment was a positive and independent act designed—at least operating—to prevent stockholders from ascertaining the facts. The withdrawals were illegal transactions; their concealment was an additional act which tolled the statute until discovery: *Deemer et al. v. Weaver,* 324 Pa. 85. It was only under date of November 27, 1925, that an entry of $20,489.37 (somewhat suspicious in nature) was made upon the books to represent the

---

[10] There were other withdrawals of the company's funds by defendant, used by him for purchases on the stock exchange, but as these items were entered on the company's books and are therefore barred by the statute, no further notice is taken of them in this opinion.

then net debit balance between defendant's deposits and withdrawals. This notation was a result of the revelations made to the board of directors; it did not disclose the various withdrawals of funds, but, as the chancellor well said, served to conceal rather than reveal them. The court below took the position, however, that while the ratification by the board of directors was legally ineffective, the knowledge which the directors then obtained as to the fact of the withdrawals was imputable to plaintiffs and caused the statute of limitations to start running at that time. In our opinion this is erroneous. When the directors deliberately attempted to validate defendant's acts they were acting adversely to the company's interests and merely assuring to defendant the profit from his use of the corporate assets. To that extent they made themselves parties to the illegal transactions. Information obtained by an agent is not binding upon his principal when acquired while acting adversely to the principal's interests. Were the law otherwise the president of a company who had taken corporate funds and concealed the transaction on the books could secretly start the statute of limitations in operation against the real persons in interest, the stockholders of the company, by informing the directors of his illegal acts and making them in effect parties to a conspiracy. It is true that the present bill asserts a cause of action which is essentially derivative from the company itself. But the "company" is the stockholders, not the directors, and the very fact that the position taken by the board of directors justifies plaintiffs in bringing the bill makes the knowledge acquired by the directors their own and not that of the stockholders whom they were supposed to represent and whose interests they should properly have protected. Indeed, since the transaction was one which the directors had no authority to ratify on behalf of their principals, it was a fortiori one in which the information gained by them in regard to it was not legally to be imputed to those principals.

It is the conclusion of the court, therefore, that plaintiffs can sustain in the present proceedings a cause of action for the profits made by defendant in the purchase of the Harter, the Carrie J. Brown, and some of the Bisler stock. The question then arises as to the amount of such profits.

During the fall of 1925 and the early part of 1926 defendant was in negotiation with certain brokers for the sale of the assets of the Paper Company to a new corporation to be formed as the result of a merger in the boxboard and container industry. This new company came into being as the Container Corporation of America, and the proposed sale to it having been ratified by the directors of the Paper Company and the Boxboard Company, the transaction was consummated in June, 1926. All of the physical assets (as distinguished from accounts receivable) of the Paper Company were sold to the Container Corporation of America for $2,865,-662.12 cash and $2,500,000 of its 7% preferred stock. The receipt of this cash and stock enabled the Boxboard Company, on July 1, 1926, to redeem its own preferred stock at $52.50 per share, and to pay three liquidating dividends on its common stock, one on June 14, 1926, of $2\frac{1}{10}$ of a share of preferred stock of the Container Corporation of America, of a value of $19.09, another on June 1, 1927, of $2.00, and a third on December 17, 1927, of $5.00. Since, for each share of the Paper Company stock which defendant purchased, he had received at the time of the merger with the Boxboard Company one share of the latter company's preferred and one share of its common stock, he now realized for each original share of the Paper Company stock an aggregate amount of $78.59.

The 2,000 shares bought from Elizabeth A. Harter cost defendant $90,000. At $78.59 per share he obtained on this stock $157,180, a profit of $67,180. The 12,862 shares purchased from Carrie J. Brown cost $600,000; on them defendant realized the sum of $1,010,824.58, a

profit of $410,824.58. The 12,863 shares also purchased from Carrie J. Brown (of which he transferred 1,000 shares to Carey at cost price) cost $600,000, toward which he used $500,000 of the company's money. The cost per share was $46.647, so that with company funds he bought in this transaction 10,718 shares. Assuming, as is most favorable to defendant, that the thousand shares transferred by him were from the portion bought with money of the company, he realized from the remaining 9,718 shares $763,737.62, a profit of $310,422.07. The 4,750 shares purchased from G. A. Bisler cost $230,375. Of this, as heretofore explained, $39,141.13 represented defendant's money and $191,233.87 that of the company. The cost per share of this stock being $48.50, 3,943 shares were purchased with the company's money, for which defendant received $309,880.37, a profit of $118,644.87. In all, therefore, defendant purchased with the company's money on items recoverable by plaintiffs in the present proceedings, 28,523 shares, on which he made a total profit of $907,071.52, and for this he should account, with interest on its component parts from the respective dates (June 14, 1926, July 1, 1926, June 1, 1927, and December 17, 1927) when he received the various payments from the Boxboard Company by way of redemption, distribution and liquidation. This sum is distributable among the outstanding 115,235 shares of Boxboard Company stock, less the 28,523 shares purchased by defendant (which must legally be regarded as if held in the treasury of Boxboard Company) or 86,712 shares.[11] On this phase of the case, therefore, plaintiffs

---

[11] On June 1, 1927, the capitalization of the Boxboard Company was reduced one-half. The calculations in this opinion, however, are on the basis of the stock before such reduction was effected, and the final award to plaintiffs must be made with that fact in mind. The distribution ordered by the chancellor was to the stockholders of the Paper Company, but, since defendant's illegal profits, if restored to the Paper Company, would ipso facto have become

are entitled to recover on each share of Boxboard Company stock held by them (when the outstanding capital stock was 115,235 shares) the sum of $10.46 per share with interest as above stated.

We come finally to a transaction connected with the sale of the Paper Company's assets to the Container Corporation of America. It appears that the purchasing company gave to defendant personally 25,000 shares of its class B, common stock, and he not only failed to reveal this fact to the Paper Company or to the Boxboard Company but actively concealed it. For the president of a corporation to make a secret profit of his own in the sale of the corporate assets is obviously indefensible. Defendant says that the Container Corporation had offered to employ him for five years at a salary of $100,000 per year, that he refused the offer, and in lieu of it was given the 25,000 shares, which were not a part of the consideration for the Paper Company's assets but an independent arrangement between him and the Container Corporation. As the chancellor found, these al-

---

the property of the Boxboard Company through its ownership of all the stock of the Paper Company, they should be distributed to the stockholders of the Boxboard Company. It is clear that when the stockholders of the Paper Company transferred their stock to the Boxboard Company, the latter succeeded to all the rights appertaining to the ownership thereof. Moreover, defendant cannot be deprived of his share of the restored profits arising from his ownership of the 38,000 shares of Boxboard Company stock, which, for reasons expressed in this opinion, cannot now be attacked by plaintiffs because of the statute of limitations. Plaintiffs argue that, if the distribution of such profits had been made before the statute barred recovery of the 38,000 shares, the portion which would have been allocated to those shares would have been payable, not to defendant, but to the treasury of the company. But the barring of the claim to the 38,000 shares also bars recovery of any dividends or allotments paid or payable thereon, and defendant, because of the operation of the statute of limitations, is as much entitled on those shares to a pro rata portion of the restored profits as he was to the liquidating dividends which he received thereon.

legations have no foundation, it being clear from a letter written to defendant by the brokers under date of April 1, 1926, that the transfer of these shares to defendant was a part of the general transaction.

The court below was of the erroneous opinion that recovery of the value of the 25,000 shares was barred by the statute of limitations. At a meeting of the board of directors of the Boxboard Company on July 29, 1926, defendant was specifically asked by Kondolf, a director, whether the report of the proposed sale to the Container Corporation as outlined in the minutes of the preceding meeting (June 14, 1926) enumerated *all* the payments which the Container Corporation "had made or is to make." This question was answered by defendant in the affirmative, and the minutes were thereupon approved. Defendant thus diverted investigation and ascertainment of the facts. It is true, as the court below points out, that the receipt by defendant of the 25,000 shares was unlawful only because it was secret, and therefore its mere concealment was not an act additional to the illegal transaction itself which would toll the running of the statute. The positive denial, however, by defendant that any such payment was made by the Container Corporation was an affirmative and independent act of misrepresentation, apart from mere secrecy or failure to reveal the truth, and brought the case directly into line with the decisions in *Hall v. Pennsylvania R. R. Co.*, 257 Pa. 54, and *Deemer v. Weaver*, 324 Pa. 85, where, under similar circumstances, it was held that the statute did not begin to operate until discovery of the fraud. Nor is it of any legal significance whether the additional act of misrepresentation occurred before or after the receipt by defendant of the 25,000 shares: *Deemer v. Weaver*, supra.

The measure of recovery applicable to this item of secret profit is the highest market value which the stock attained between the time when defendant received it

and the date of discovery by plaintiffs.[12] This value, according to the testimony, was $19.25 per share, an aggregate of $481,250, with interest from April 20, 1928,[13] which was the date on which that value could have been realized in the market. This sum should have been received by the Boxboard Company as additional consideration for the sale of the Paper Company's assets, and as such distributed among the holders of 86,712 outstanding shares of that company.[14] Such an allocation would amount to $5.55 per share, with interest as stated, and plaintiffs are entitled to that amount upon each share held by them in the Boxboard Company prior to the reduction of the capital stock on June 1, 1927. .

Ordinarily plaintiffs could not have maintained the present bill in equity without first having demanded of the board of directors that the company itself should proceed against defendant. Where, however, as here, such a request would obviously have been futile, the need for making it disappears. The directors of both the Paper Company and the Boxboard Company, on being informed by defendant of his withdrawal of corporate funds, not only took no action to protect the interests of the stockholders but passed resolutions seeking to ratify defendant's acts. They could not later be expected to sue for a redress of wrongs which they had sought to validate. Moreover, the Paper Company, by the sale of its property, has become practically defunct,

---

[12] Since the stock really belonged to the Boxboard Company, defendant, from a legal point of view, was in the position of having converted it to his own use. Hence the rule embodied in the Act of April 10, 1929, P. L. 476, should apply.

[13] There is evidence that defendant was paid dividends on the Container Corporation stock during the time he held it, but the amount is not shown in the record with sufficient definiteness to permit their consideration.

[14] See footnote 11 as to why this number of shares is adopted as entitled to participate in the distribution.

and the Boxboard Company also has liquidated its assets. Both companies exist merely as legal entities. Under such circumstances plaintiffs were justified in proceeding on their own initiative without previously calling upon the board of directors to act: *Commonwealth Title Ins. & Trust Co. v. Seltzer*, 227 Pa. 410; *Lowman v. Harvey R. Pierce Co.*, 276 Pa. 382. It is true that both corporations should have been joined as parties defendant, but no preliminary objection was made to the non-joinder, and it cannot now be made the subject of complaint. Distribution of the amount recoverable can properly be made directly to plaintiffs. It is not necessary that the money should be paid into the treasury of the Boxboard Company and then re-distributed, since shareholders other than the plaintiffs have presumably either assented to defendant's acts or waived their rights in the present proceedings by failure to join therein. Direct relief to stockholders in such cases has been held proper: *Backus v. Finkelstein*, 23 Fed. (2d) 357; Fletcher, Encyclopedia of Corporations, Vol. 13, sec. 6028.

Plaintiffs acted promptly upon discovery of defendant's acts complained of in this suit. They retained counsel and made demand for the production of the books of the Paper Company and the Boxboard Company, but their request was refused and protracted proceedings were necessary in order to obtain the right to make the desired examination: *Bailey v. Boxboard Products Co.*, 314 Pa. 45. It was only through such an investigation that they were able to procure the information upon which to base the present action.

The decree of the court below dismissing plaintiff's bill is reversed; the bill is reinstated, and the court below directed to enter a decree ordering defendant to pay to plaintiffs respectively the amounts herein indicated. Costs to be paid by appellee.