**FAYES, Inc., Plaintiff,**

v.

**J. Jay KLINE, Defendant.**

United States District Court
S. D. New York.

Nov. 9, 1955.

11. 8 U.S.C.A. § 1252(b) (4).

Nathan Shapiro, New York City, for plaintiff.

Spiro, Felstiner & Prager, New York City, Clarence R. Treeger and Bruno Schachner, New York City, of counsel, for defendant.

**WEINFELD, District Judge.**

The plaintiff, Fayes, Inc., charges that the defendant, J. Jay Kline, its president and director, violated his fiduciary duty to the plaintiff in that he misappropriated a valuable corporate opportunity, to wit, the expectancy of renewal of its existing lease; and further misappropriated all its remaining assets, consisting of an inventory and fixtures.

It is, of course, a fundamental principle that directors and officers of a corporation occupy a fiduciary relationship to the corporation and its stockholders and must act in the utmost good faith in managing corporate affairs. Since the Court's jurisdiction rests upon diversity of citizenship, the applicable law is that of the State of Pennsylvania where plaintiff was incorporated, carried on its business, and where the acts complained of occurred. The leading cases in Pennsylvania are Bailey v. Jacobs, 325 Pa. 187, 189 A. 320, and Lutherland, Inc., v. Dahlen, 357 Pa. 143, 53 A.2d 143, 147.[1]

1. This accords with New York law. Kavanaugh v. Kavanaugh Knitting Co., 226 N.Y. 185, 123 N.E. 148; Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545,

In the latter case the Court stated:

"[I]t is well settled, and indeed is embodied in the statutory law of the Commonwealth, Business Corporation Law of May 5, 1933, P.L. 364, § 408, 15 P.S. § 2852–408, that officers and directors are deemed to stand in a fiduciary relation to the corporation. They must devote themselves to the corporate affairs with a view to promote the common interests and not their own * * *. In short, there is demanded of the officer or director of a corporation that he furnish to it his undivided loyalty; if there is presented to him a business opportunity which is within the scope of its own activities and of present or potential advantage to it, the law will not permit him to seize the opportunity for himself * * *."

Upon a careful review of the entire evidence I am satisfied that the plaintiff has sustained its burden of proof. If "demeanor" evidence has any value at all, then I am compelled to the conclusion that the defendant's testimony on substantial points must be rejected as utterly unreliable. His testimony was steeped in palpable evasion, contradiction, and alleged lack of memory on vital matters. He impressed me as fabricating various significant events, creating incidents which did not occur, and distorting those which did occur. Exhibits in evidence, as well as his pretrial deposition bear mute witness to the unreliability of his testimony upon this trial. On the other hand, I am satisfied that Smiley, his fellow director and equal stockholder, gave a substantially accurate version of events and conversations.

Prior to the incorporation of the plaintiff, Kline and Smiley, from 1932 to 1946, had operated as partners, under a leasing arrangement, the ladies' ready-to-wear department of Ellis Mills of Pottstown, Inc., a department store. They did so originally under a written five year lease.

62 A.L.R. 1; Gildener v. Lynch, 184 Misc. 427, 54 N.Y.S.2d 823. See also Guth v. Loft, Inc., 23 Del.Ch. 255, 5 A.2d 503; Note, 39 Colum.L.Rev. 219.

Thereafter from about 1937 or 1938, they continued to operate the department without any written lease until April, 1946. At that time plaintiff was incorporated. Thereupon a five year lease, expiring on April 15, 1951, was entered into wherein plaintiff corporation was named as tenant. The corporation succeeded to the partnership assets, but in general the business was conducted as in previous years. Kline and Smiley who were officers and directors acted on an informal basis. Each had other interests, and the activities of the plaintiff were carried on by employees under the supervision of a general manager. It was never intended that either should devote full time to the affairs of the corporation, and neither did.

Early in March, 1951 Ellis Mills, of Pottstown, Inc., the department store owner, mailed to Kline in his capacity as president of the plaintiff a renewal lease for five years in which the corporation was named as the tenant. The renewal lease was never signed. It was retained by Kline for almost eight weeks, and then a lease was executed in which he was named as the individual and sole lessee. This lease, in the words of the vice-president of the landlord corporation " * * follows the previous lease with the exception that it is drawn to you as an individual."

Although the lease to the defendant was to commence on June 1, 1951, apparently later changed to July 1, 1951, the plaintiff corporation remained in possession and carried on business as always until July 31, 1951. On that day Kline without prior resolution of the corporation, without its or Smiley's consent or legal sanction of any kind, took unto himself the remaining assets of the plaintiff, lock, stock and barrel—consisting of merchandise, inventory and fixtures.

██ The expectancy of renewal of an existing lease is recognized as a valu-

able property right.[2] Here the corporation's right had progressed beyond mere hope or expectancy of renewal. In this case, unlike most, renewal in fact had been tendered by the landlord but was pre-empted by the defendant to his own advantage and to the detriment of the corporation. The defendant beyond question by his conduct violated his fiduciary duty to the plaintiff as its director and officer. His actions bear the imprint of lack of candor, selfishness and bad faith— the very antithesis of the guides of fair dealing for those who are under fiduciary obligation.[3]

I find that the defendant from early in March, 1951 when he received the lease, never informed his fellow director or officer that the landlord had tendered a renewal lease to the plaintiff corporation, but on the contrary, the defendant concealed this information; that from early March he secretly undertook to obtain the lease for himself, and to accomplish this purpose embarked on a campaign to undermine the relationship existing between the landlord and Smiley without cause or justification; that Smiley first learned the renewal lease had been tendered to the plaintiff corporation when he received a letter from the landlord dated May 12, 1951 stating, "We submitted a lease early in March but it has never been signed"; that shortly before or at or about that date, as the culmination of the defendant's illicit activities, he succeeded in obtaining a commitment of the lease in his favor; the formal written agreement was not mailed to him until on or about May 18th and executed and returned by him to the landlord on or about May 24th.

I find without substance and contrived the claim that it was because of Smiley's "apparent neglect" of the affairs of plaintiff corporation as the reason for the landlord's reversal of its previous decision to renew the lease with plaintiff

2. Robinson v. Jewett, 116 N.Y. 40, 22 N.E. 224; see also McCourt v. Singers-Bigger, 8 Cir., 145 F. 103, which closely parallels the present situation.

3. Cf. Kavanaugh v. Kavanaugh Knitting Co., 226 N.Y. 185, 193, 123 N.E. 148.

and instead to favor the defendant. The suggested reason for the shift falls of its own weight and is belied by a fact which cannot be downed. The fact is that early in March, 1951 the landlord, despite the alleged concern over Smiley's lack of more active participation in plaintiff's affairs, submitted the renewal lease and beyond question intended to continue plaintiff corporation as tenant for another five years—and not the defendant. Although I am not called upon to pass upon the question since the landlord is not a party to this suit, I cannot refrain from noting that its subsequent action in granting the lease to the defendant, viewed against (1) its original decision to renew the lease with the plaintiff— without reservation or conditions, particularly as to activities of Smiley—and, (2) all the facts and circumstances, strongly suggest the applicability of the doctrine which imposes liability upon those who aid fiduciaries to violate their trust, as enunciated in Irving Trust Co. v. Deutsch, 2 Cir., 73 F.2d 121.

Based upon my observation of defendant and Mrs. Mills, the officer of the landlord who states she was responsible for the final decision, I am persuaded that the entire story of their talks and the defendant's activities from early March to May 10th to procure the lease in his individual name has not been told to the Court.

Mrs. Mills, like the defendant, gave contradictory testimony and appeared to suffer from faulty memory as to certain significant matters, but again like the defendant, was categorical as to events on and after the evening of May 10th, which neatly dovetailed with the theory of his defense. The significance of certainty as to that date becomes manifest in view of (1) the defendant's admission that from March 15th and up to May 10th he had never discussed with Smiley the desirability of executing the lease which had been proferred to the corporation; (2) his denial that up to May 10th he had discussed and negotiated with Mrs. Mills the granting of the lease to him individu-

ally; and (3) his claim that at a conference with Smiley on May 10th he told the latter, in effect, that each was on his own and free to seek the lease individually. Undoubtedly when Kline and Smiley met on the latter date they did discuss the crisis in their affairs brought on by the defendant's conduct. But again I am satisfied that in keeping with his duplicitous activities Kline failed to divulge at that time that the corporation had been tendered a renewal lease.

I accept in substance Smiley's version of this meeting and that at its conclusion it was agreed to defer for several weeks further consideration of matters. No such further conference was held. Instead, almost immediately thereafter, as a result of his earlier activities, defendant wound up with the written lease in his individual name. And even after he had the lease he continued his double dealing by failing to disclose at a meeting with Smiley's lawyer on May 23rd and again at a later one, that he had been favored with the tenancy, apparently *for the purpose of making it appear that* plaintiff corporation or Smiley had an equal opportunity with him to compete for the lease.

Such portions of Mrs. Mills' testimony as may be given credence serve to establish that prior to the May 10th meeting, notwithstanding defendant's denials, he negotiated directly or indirectly to secure the lease for himself.

■ Assuming arguendo that Smiley did not perform his duties as an officer and director of the plaintiff corporation— and I do not so find—that gave the defendant no right to despoil the property of the plaintiff. Appropriate remedies were available if such were the fact. And if the defendant wanted, as he termed it, a "divorce" from Smiley, his fellow stockholder, he was not empowered to violate the corporate rights. Obviously without a lease plaintiff's life was at an end. With a renewed lease it was a continuing business. Up to April 15, 1951 it had never operated at a loss. And, as a going business if the stockhold-

ers had reached the parting of the ways, the shares of stock could have been disposed of either by mutual consent or failing such arrangements, by dissolution or other legal procedure. Instead, he put the plaintiff out of business; he appropriated first the lease and then all other assets.[4]

The fact that two months after he had taken the inventory and fixtures he tendered to the corporation a sum reflecting his idea of their market value does not legalize his conduct, nor condone the violation of his duty toward the plaintiff. His action reflects a continuing general attitude of wanton disregard not only of the rights of the corporation but also of the rights of an equal stockholder.

Such cases as Browne v. Scull, 27 Pa. Super. 513, and Lafferty v. Lafferty, 174 Pa. 536, 34 A. 203, 205, and others relied upon by the defendant, are readily distinguishable. In those instances, apart from the fact that the particular business in question had been terminated or dissolved, the landlord genuinely was unwilling to grant the renewal of the lease unless one of the former parties in interest was excluded. Here, as we have seen, the plaintiff's expectancy of renewal ripened into fact only to be diverted by the defendant's faithless conduct.

Plaintiff is entitled to a decree in its favor requiring the defendant to account, and such other relief as shall fully restore to it its rights.

The foregoing shall constitute the Court's findings of fact and conclusions of law. Either party may within five days from the filing of this opinion, upon notice to the other, propose additional findings.

4. Parenthetically it may be observed that apart from the deprivation of the right of renewal for a five year period, it would appear that defendant also invaded plaintiff's right to tenancy until April 15, 1952. On the expiration of the original lease on April 15, 1951 plaintiff remained in possession with the consent of the landlord and continued to operate the department until July 31, 1951 when defendant took over the inventory. The acceptance by the landlord of the rental from the plaintiff created a new tenancy from year to year. Mace v. Wilson, 49 Pa.Super. 378.