HEFFNER, R. Merle and Heffner, Ada, Appellants in No. 80–2625,

v.

UNION NATIONAL BANK AND TRUST COMPANY; Crotsley, C. Kenneth; Goodwin, Joseph W.; Hickes, Paul E.; Horton, Veryl E.; Huston, William C.; Kunz, David G.; Langdon, Richard M.; Love, C. James; Miller, C. Blair; Neary, Arthur R., Sr.; Porter, Wesley A.; Shafer, Ira R.; Wible, Clair C.; Wible, Freddie E.; Brown, John B.; Kunz, John B; Oxnard, Robert T., Cross-Appellants in No. 80–2626.

Nos. 80–2625, 80–2626.

United States Court of Appeals, Third Circuit.

Argued Jan. 15, 1981.

Decided Jan. 29, 1981.

Terence P. Kemp (argued), Columbus, Ohio, Charles F. Daum, Huntingdon, Pa., for appellants in No. 80–2625, cross-appellees in No. 80–2626.

R. Stephen Shilba (argued), Henry W. Rhoads, Rhoads, Sinon & Hendershot, Harrisburg, Pa., for appellees in No. 80–2625, cross-appellants in No. 80–2626.

Before SEITZ, Chief Judge, and ROSENN and SLOVITER, Circuit Judges.

OPINION OF THE COURT

SEITZ, Chief Judge.

R. Merle and Ada Heffner appeal from an order of the district court granting summary judgment in favor of the defendants; the defendants cross appeal from the same order.

## I.

The Union National Bank (UNB) is a national banking association with its main office in Huntingdon, Pennsylvania. UNB's directors are elected for a one-year term at the annual shareholders' meeting, which is held on the third Tuesday of each February. The directors are elected by means of cumulative voting. In February 1979, a Board of sixteen directors was elected, consisting of the following persons: C. Kenneth Crotsley; Robert F. Fink; Joseph W. Goodwin; R. Merle Heffner; Paul E. Hickes; Veryl E. Horton; William C. Huston; David G. Kunz; Richard M. Langdon; C. James Love; C. Blair Miller; Arthur R. Neary, Sr.; Wesley A. Porter; Ira R. Shafer; Clair C. Wible; and Freddie E. Wible.

UNB's by-laws provide that the number of directors shall be between five and twenty-five, the exact number to be fixed from time to time by resolution of the Board or the shareholders. On December 21, 1979, the Board adopted a resolution that the number of directors be reduced from sixteen to fifteen. The Board also adopted a recommendation that it list fifteen candidates on the proxy to be sent shareholders before the February 1980 election, and that each current director except Robert F. Fink be listed. The President of UNB, Joseph W. Goodwin, requested that William C. Huston and David G. Kunz serve on a proxy committee with himself and Proxy Committee Chairman Richard M. Langdon. This committee had its first formal meeting on January 24, 1980.

On January 28, 1980, the Board issued a proxy form (the Management Proxy), which was mailed to every shareholder of record. The Management Proxy provided as follows:

I, the undersigned Shareholder ... of UNION NATIONAL BANK AND TRUST COMPANY OF HUNTINGDON, ... do hereby ... appoint John B. Brown, John B. Kunz and Robert T. Oxnard (or any one of them with full power to act alone), my ... lawful attorney(s) with full power of substitution, for me in my name ... to vote all the Common Capital Stock of said Bank standing in my name ... at the annual meeting of its Shareholders ... on the 19th day of February, 1980 ... with all the powers the undersigned would possess if personally present *as follows:*

1. Fixing the number of directors for the ensuing year at 15 and the election of the following nominees [followed by a list of the recommended fifteen directors, including Mr. Heffner].

. . . . .

This Proxy is solicited on behalf of management and may be revoked prior to its exercise by giving notice of such revocation to the Secretary of the Bank.

(Emphasis added). When the Management Proxies were mailed to all shareholders, UNB management knew that one or more minority candidates might seek election to the Board.

On February 4, 1980, UNB received official notice that two minority shareholders, Mr. Robert F. Fink, the director who was not listed on the Management Proxy, and Ms. Christine Schucker, would seek election to the Board. The entire Board was informed of their nominating letters at a Board meeting on February 5. Two days later, the proxy committee met to discuss updating management solicitation. The committee discussed the nominations of Mr. Fink and Ms. Schucker, but reached no decision.

On February 14, Mr. Goodwin informed Messrs. Brown, Kunz, and Oxnard, the individuals designated to vote the Management Proxies, that the voting at the meeting might be unusual, and that UNB counsel would answer any questions that might arise at the shareholders' meeting. The next day, the proxy committee met and discussed for the first time the possibility of voting for less than the fifteen candidates listed on the Management Proxy. A list of "nonpreference" was established: if it became necessary to support less than the full management slate, support would be withdrawn first from Mr. Heffner, second from Mr. Langdon, and third from Mr. Shafer. The committee also decided that a new

proxy form would be drawn up by Mr. Goodwin. Later that day, Mr. Goodwin asked UNB's secretary to type a proxy form that did not specify for which directors it would be voted (the Special Proxy), and that stated, like the Management Proxy, that it was being solicited on behalf of management. Again, like the earlier Management Proxy, these Special Proxies were to be voted by Brown, Kunz, and Oxnard. The Special Proxies were hand delivered to certain shareholders selected by Mr. Goodwin. Twelve Special Proxies, representing 10,984 shares of UNB stock, were returned before the meeting.

Because the committee decided to keep the decisions made at this meeting confidential, the other directors were not informed of either the list of nonpreference or the Special Proxy. It is undisputed that historically the proxy committee had performed only ministerial functions and had never withdrawn support from a management candidate, and that the Bank had never had a proxy contest before.

At the shareholders' meeting, prior to the actual casting of ballots, management registered 134,560 shares (2,018,400 votes), and the minority proxyholders registered 20,138 shares (302,070 votes). Neither side knew how the other planned to vote its shares. It was not disclosed that management had 123,576 Management Proxies and 10,984 Special Proxies. Because 145,035 votes were required to ensure the election of one director, management had enough votes to guarantee the election of thirteen Board members, assuming that management was free to cumulate its 2,018,400 votes in any way it chose.

Management cast 145,100 votes in favor of each of thirteen of the fifteen listed candidates (excluding Mr. Heffner and Mr. Langdon in accordance with the list of nonpreference); the remaining management votes, 132,100, were all cast for Mr. Langdon. As a result, Mr. Heffner received only fifteen votes at the election despite the fact that he was listed on the Management Proxy. When voting, the management proxyholders made no distinction between voting the Management Proxies and the Special Proxies. The minority proxyholders cast 176,040 votes for Ms. Schucker, 125,835 votes for Mr. Fink, and 15 votes for each management candidate other than Mr. Huston and Mr. Neary. Because the minority proxyholders had not voted in the most effective manner, they elected only one director to the Board.

Mr. Heffner brought this action against UNB, the individual directors (other than Ms. Schucker) who were elected to the Board, and the management proxyholders, alleging violations of the National Banking Act, 12 U.S.C. §§ 38 et seq. (1976). On February 22, 1980, Mr. Heffner filed a motion for a temporary restraining order seeking to enjoin the new Board from taking office, which the district court granted until February 29. On February 29, the district court extended the temporary restraining order for ten days. On March 10, the court issued an order refusing to extend further the temporary restraining order. Less than one month later, the district court denied Mr. Heffner's motion for a preliminary injunction.

Because the temporary restraining order was in effect, the first scheduled meeting of the 1980 Board of Directors on March 4 was attended by the old, not the new, Board. At that meeting, Mr. Langdon informed the Board of the secret meetings and decisions of the proxy committee. The Board passed resolutions purporting to ratify these actions over the objections of Mr. Fink and Mr. Heffner.

Mr. Heffner filed a motion for summary judgment in the district court. On September 29, 1980, the court entered judgment for UNB. The court reasoned that votes cast upon the authority of the Management Proxies could not be cumulated because the Management Proxies required the proxyholders to cast an equal number of votes for each of the fifteen listed candidates. Thus, the court agreed with Mr. Heffner that these proxies had not been voted as authorized. However, the court entered judgment for UNB because it found that Mr. Heffner would not have been elected even

if the Management Proxies had been voted equally for all fifteen candidates because he had received no votes from the Special Proxies. Finally, the court held that the Special Proxies were valid and had been voted properly.

Mr. Heffner challenges the district court's decisions that the outcome of the election was not affected by the improper voting of the Management Proxies, and that the Special Proxies were valid and had been voted properly. UNB and the individual defendants challenge the court's holding that the Management Proxies had been voted improperly at the shareholders' meeting.

## II.

At the outset, we address the defendants' contention that the district court erred in holding that the Management Proxies had been voted improperly. UNB shareholders have the power to vote cumulatively. *See* 12 U.S.C. § 61 (1976). Whether a shareholder intends to authorize the proxyholder to cumulate votes for fewer than the authorized number of directors should be determined by examining the proxy form itself.

In this case, the district court concluded that the Management Proxies did not authorize the proxyholders to cumulate votes for less than the fifteen listed candidates. In reaching this conclusion, the court reasoned that the language of the Management Proxies was clear, providing that the proxyholders would vote "as follows," and then listing the names of fifteen candidates. On appeal, the defendants advance three reasons, which were rejected by the district court, for finding that these proxies gave the proxyholders the authority to cumulate votes for less than the fifteen candidates listed on the slate.

█ First, the defendants rely on the fact that the Securities and Exchange Commission in 1979 withdrew two requirements in connection with a proposed rule: one that would have permitted proxy forms to provide a means for the shareholder to grant discretionary authority to cumulate

shares for any nominees other than those the shareholder had voted against, and one that would have required proxy forms to state the order of preference in which the shares would be cumulatively voted. However, this action by the Commission does not further the defendants' argument that the Management Proxies solicited in this case actually provided for such authority. In withdrawing the former proposal, the Commission reasoned that "this aspect of the rule was permissive . . ., and issuers presently *can provide for such authority on the form of the proxy* if they desire to do so." 44 Fed.Reg. 68,766 (Nov. 29, 1979) (emphasis added). In rejecting the latter proposal, the Commission reasoned that to require proxies to state the order of preference might restrict management's effectiveness and ability to act at the meeting, might be needlessly divisive and of questionable relevance, and might actually make it impossible to cumulate votes. *See id.* at 68,769. Therefore, we conclude that the Commission's decision to withdraw these proposals indicates only a belief that management has the ability to solicit proxies that confer the discretionary authority to cumulate votes for any nominees other than those the shareholder has voted against, and that management should not be required to state an order of preference when it solicits such a proxy. We do not believe that this decision by the Commission is relevant to the issue that we must decide, *i.e.* whether the Management Proxies solicited in this case conferred the authority to cumulate votes for fewer than the fifteen listed candidates.

Second, the defendants rely on excerpts from Aranow & Einhorn, *Proxy Contests for Corporate Control* 166 (1968). However, these excerpts do not advance the defendants' position. Like the Commission's withdrawal of the above proposals, these excerpts serve to demonstrate only that management has the authority to solicit proxies conferring the authority to cumulate votes according to its discretion.[1]

---

1. The cases relied on by the defendants in arguing for reversal are equally inapposite. They

involve proxies that conferred unlimited discretion on the proxyholder, not proxies that pro-

■ Third, the defendants argue that, by giving their proxies to the management proxyholders, the shareholders intended to assure that the maximum number of management candidates would be elected. Therefore, the defendants argue that the district court's decision that the votes could not be cumulated for fewer than the fifteen listed candidates thwarts the intent of the shareholders. Although the defendants' characterization of the shareholders' intent is plausible and may reflect the intent of some of the shareholders, it provides no basis for overturning the district court's finding. The district court's finding as to the shareholders' intent was not clearly erroneous. To the contrary, we believe that the district court's finding that, by returning the Management Proxies, the shareholders intended to support each of the fifteen candidates, and not to give the proxyholders the discretion to withdraw support from whichever ones they chose, is at least as plausible as the defendants' characterization of the shareholders' intent.[2]

Moreover, before the Management Proxies were sent to the shareholders, UNB knew that nonmanagement candidates might seek election to the Board. As early as February 4, 1980, UNB had official notice that at least two nonmanagement candidates were mounting serious challenges. We agree with the district court that the management of UNB had ample opportunity to solicit proxies that gave the proxyholders the authority to cumulate votes for fewer than the fifteen listed candidates, which in fact the proxy committee did when it solicited the Special Proxies. Although management had this opportunity, it chose not to solicit proxies similar to the Special Proxies from all of the shareholders. In-

stead, a few of the directors secretly decided to solicit new proxies that did not bind the proxyholders to vote for the fifteen listed candidates. We believe that this course of action supports the district court's conclusion as to the shareholders' intent in returning the Management Proxies, and we cannot accept the defendants' argument that the district court's decision frustrated the intent of the UNB shareholders.

We conclude that the district court was correct in finding that the Management Proxies did not confer the authority to cumulate votes for fewer than the fifteen listed candidates. Therefore, by combining the Management Proxies with the Special Proxies and cumulatively voting all the shares to ensure the election of thirteen candidates, casting the remainder of the votes for Mr. Langdon, and withdrawing all support from Mr. Heffner, the management proxyholders voted the Management Proxies in an unauthorized manner. This action deprived the UNB shareholders who returned the Management Proxies, including the Heffners, of their federal right under 12 U.S.C. § 61 to vote their shares as they see fit. Because the Board had no authority to direct that the proxyholders vote the Management Proxies for other than the fifteen candidates listed on the proxy, it was without authority to ratify that decision at the Board meeting after the election. *See Bailey v. Jacobs*, 325 Pa. 187, 200, 189 A. 320, 327 (1937).[3]

In reaching this conclusion, we do not mean to imply that management is powerless to solicit proxies conferring authority to cumulate votes for fewer directors in order to elect the maximum number of directors to the Board. Nor do we mean to imply that management must state its or-

---

vided that management would vote for a particular slate. *See, e. g., Hauth v. Giant Portland Cement Co.,* 33 Del.Ch. 496, 96 A.2d 233 (Del. Ch.1953).

2. For example, the Heffners did not intend to give management proxyholders the discretion to withdraw support from Mr. Heffner when they returned Management Proxies for their 788 shares.

3. Although the National Banking Act governs the actions of national banking associations and their directors, *see* 12 U.S.C. §§ 38 et seq. (1976), national banks are also subject to state laws not in conflict with the federal laws. *See, e. g., Wolpert v. First National Bank,* 381 F.Supp. 625, 628 n. 5 (E.D.N.Y. 1974).

der of preference if it does solicit such proxies. We merely conclude that when a proxy form states that the management proxyholder will vote *as follows,* and then provides a list of names, a shareholder who returns such a proxy does not confer discretionary authority to cumulate votes for fewer than the listed candidates.[4]

### III.

■ Although the district court found that the Management Proxies had been voted in an unauthorized manner, it refused to set aside the election because it concluded that the improper voting did not affect the outcome of the election. In reaching this conclusion, the district court reasoned that because Mr. Heffner did not receive any votes from the Special Proxies, he would not have been elected, and the same fifteen persons would have been elected, even if the Management Proxies had been voted equally for all fifteen candidates. Mr. Heffner argues that this holding was erroneous because it is impossible to reconstruct the vote and any attempt to do so involves mere speculation.

It is undisputed that there is no way to ascertain precisely the manner in which the Special Proxies were actually voted because the management proxyholders did not distinguish between the Special and the Management Proxies when they voted. It is also undisputed that Mr. Heffner received no votes from any proxies voted by the management proxyholders, whether characterized as Special or Management; thus he obviously would not have received any Special Proxy votes had the Management Proxies been voted properly. However, we do not believe that this fact indicates that the election results were not affected by the improper voting of the Management Proxies, or that Mr. Heffner necessarily would have been defeated. At best, it demonstrates only that Mr. Heffner cannot prove that he would have been elected if the Management Proxies had been voted properly.

In reconstructing the vote, the district court assumed that the management proxyholders would have voted the Special Proxies equally for the fourteen management candidates other than Mr. Heffner because this would have given effect to the list of nonpreference established by the proxy committee.[5] Given the manner in which the minority proxyholders cast their votes, this reconstruction of the vote would have resulted in the election of the maximum number of candidates listed on the Management Proxy. However, at the time the management proxyholders were required to vote, they did not know the distribution of the minority proxyholders' votes. Had the minority proxyholders voted in the most effective manner, they not only would have elected both Ms. Schucker and Mr. Fink, but they also would have determined which of the fourteen management candidates would have been eliminated if the Special Proxies had been voted according to the district court's reconstruction of the vote.[6] This was precisely the result that the proxy

---

4. Nor are we persuaded by the defendants' argument that this decision will discourage management from ever listing a slate of candidates when it solicits proxies. Merely providing a list does not preclude cumulative voting for less than the entire slate as long as the proxy form indicates in some manner that the proxyholders may cumulate votes, or that they will vote for some or all of the candidates. In this case the Management Proxies left no discretion to the proxyholders.

5. Under the district court's reconstruction, the following would have resulted: Ms. Schucker and Mr. Fink would have retained the 176,040 and 125,835 votes they received respectively (they were unaffected by the voting of the management proxyholders); Mr. Heffner

would have received 123,591 votes (123,576 from the Management Proxies and 15 from the minority proxies); Mr. Huston and Mr. Neary would have received 135,344 votes (123,576 from Management Proxies and 11,768 from the Special Proxies); and the remaining management candidates would have received 135,359 votes (123,576 from Management Proxies, 11,-768 from Special Proxies, and 15 from minority proxies). Thus, the same 15 persons would have been elected.

6. If the management proxyholders had voted according to the district court's reconstruction, and the minority had given both Mr. Fink and Ms. Schucker 145,035 votes (just enough to ensure election), each management candidate other than Mr. Heffner would have received

committee wanted to avoid when it established the list of nonpreference and decided to cumulate votes in order to ensure that the maximum number of their choosing would be elected. Therefore, we cannot be sure that the management proxyholders would have voted the Special Proxies equally for each of the fourteen candidates other than Mr. Heffner as the district court assumed.

For example, the management proxyholders might have cumulated the Special Proxy votes to ensure the election of seven directors,[7] and then they might have either distributed the remaining votes equally among the seven management candidates other than Mr. Heffner, voted them all for an eighth to effectively ensure his election, or distributed them equally among the five remaining management directors who did not appear on the list of nonpreference. If they had distributed the remaining votes according to either of the last two possibilities, Mr. Heffner either would have been elected, or he would have tied with at least two, and possibly as many as seven, of the other management candidates for the remaining positions on the Board. On the other hand, instead of cumulating the Special Proxy votes to ensure the election of seven directors, the management proxyholders might have voted the Special Proxies equally for the twelve management candidates who were not on the list of nonpreference. By casting the Special Proxy votes in this manner, the management proxyholders could be virtually positive that these twelve directors would be elected. If the management proxyholders had voted the Special Proxy votes in this manner Mr. Heffner would have tied with Mr. Langdon and Mr. Shafer for the fifteenth directorship.

We simply cannot determine how the Special Proxies would have been voted if the Management Proxies had been voted properly. Therefore, we cannot even determine how many of the fifteen candidates listed on the Management Proxy would have been elected, much less which candidates would have been defeated. The only thing that can be determined is that Ms. Schucker would have been elected to the Board. Other than the election of Ms. Schucker, we believe that the results of this hypothetical election are impossible to ascertain. Further, we believe that Mr. Heffner could have been elected under several possible reconstructions of the vote. Therefore, we conclude that the election was invalid and should be set aside insofar as the fourteen candidates listed on the Management Proxy are concerned,[8] and that the district court should enter a declaratory judgment to that effect. Having concluded that the election must be set aside as to the directors other than Ms. Schucker, we need not address Mr. Heffner's arguments that the Special Proxies were invalid.

## IV.

Fashioning a remedy in this case is especially difficult because there is no way to determine who, other than Ms. Schucker, would have been elected; there is no reason to invalidate the election of Ms. Schucker; and to order a new election would be a futile act because the annual election is to be held in less than one month. At oral argument, Mr. Heffner's counsel requested that we (1) declare the election invalid; (2) order that the proxies solicited by management for the February 1981 election indicate that the previous election has been declared invalid as to all directors other than Ms. Schucker because the Management Proxies were improperly voted; (3)

---

135,344 votes and there would have been a 14-way tie for 13 directorships. Thus, the remaining 12,000 minority votes could have determined which of the fourteen candidates would have been on the Board.

**7.** If each of the 15 management candidates received 123,576 votes from the Management Proxies, the Special Proxies only represented enough votes to guarantee that seven candidates would receive 145,035 votes (the number

needed to ensure election), with 14,547 votes remaining.

**8.** There is no reason to set aside the election of Ms. Schucker: it was not affected by the improper voting because she received no votes from either the Management or the Special Proxies, and she received more than the minimum number of votes needed to ensure election to a 15-member Board.

award him director's pay for 1980; and (4) ensure that he does not lose the ability under UNB's by-laws to retire at age seventy instead of age sixty-eight because of his director status.

We have declared that the election was invalid as to all directors except Ms. Schucker. Because it is unclear from the record on appeal whether the Heffners requested in the district court that a statement that the election has been declared invalid be included in the proxies to be solicited for the February 1981 election, or whether the defendants have ever been given the opportunity to respond to this request, we believe that the district court should consider whether this relief should be granted when it enters the declaratory judgment. Further, we do not believe that the interpretation of UNB's by-laws is properly before us on this appeal. Therefore, we cannot determine the amount of back-pay, if any, to which Mr. Heffner is entitled, nor can we interpret the retirement provision in the by-laws to ascertain the effect of the invalid election on Mr. Heffner's retirement. Finally, we note that as a result of our decision, the Board will consist of the holdover directors from the 1979 Board who are still qualified directors and Ms. Schucker, who was validly elected and is a qualified director; we also note that the Board by resolution, and the shareholders by vote at the February 1980 election, reduced the number of directorships to fifteen. If it is necessary to implement our decision, the Board must take appropriate action under the by-laws to authorize the necessary number of directorships until the February 1981 election.

## V.

We conclude that the district court was correct in holding that the Management Proxies were voted in an unauthorized manner. Further, because the results of the election cannot be reconstructed if the Management Proxy votes are redistributed as they should have been voted, and because Mr. Heffner would have been elected under several possible reconstructions of the vote, we declare that the election was invalid as to all directors other than Ms. Schucker.

The district court will consider the appropriateness of ordering that the proxies to be solicited for the February 1981 election contain a statement that the February 1980 election was invalid as to all directors other than Ms. Schucker because the Management Proxies were voted in an unauthorized manner. Because the election will be held in less than one month, the district court should make this determination as soon as possible. Finally, the district court will order that the Board take appropriate action fixing the number of directors to accommodate the holdover directors and Ms. Schucker until the February 1981 election.

## VI.

The order of the district court will be vacated, and the case remanded for proceedings consistent with this opinion. The mandate will issue forthwith.